CAO HE LIN, a/k/a Je Ling Chao, Petitioner,

v.

UNITED STATES DEPARTMENT OF JUSTICE and Attorney General Gonzales, Respondents.*

Docket No. 02–4814.

United States Court of Appeals, Second Circuit.

Submitted: Feb. 1, 2005.

Decided: Nov. 4, 2005.

---

* The Clerk is requested to modify the official caption to reflect the correct order of Cao's name.

Bruno Joseph Bembi, Hempstead, NY, for Petitioner.

Christopher J. Christie, United States Attorney for the District of New Jersey, and Peter G. O'Malley, Assistant United States Attorney, for Respondents.

Before: POOLER and B.D. PARKER, Circuit Judges, and CASTEL, District Judge.**

POOLER, Circuit Judge.

Cao He Lin petitions for review of an order of the Board of Immigration Appeals ("BIA") affirming, without opinion, an order from an Immigration Judge ("IJ") denying Cao asylum, withholding of removal, and relief under the U.N. Convention Against Torture ("CAT"). As in many such cases, the pivotal issue is petitioner's credibility, an issue that the IJ determines in the first instance.

As we explain in more detail below, we will not reject the IJ's factual findings if they are supported by substantial evidence, that is, if a reasonable fact-finder would not be compelled to make contrary findings. On the other hand, the IJ must act fairly in judging credibility and in assessing the sufficiency of the evidence. For example, she may not engage in speculation or rely solely on minor inconsistencies to find an applicant incredible. And, if she intends to rely on the absence of certain corroborative evidence to hold that an ap-

** The Honorable P. Kevin Castel of the Southern District of New York, sitting by designa-tion.

plicant has not satisfied his burden of proof, she must give the applicant an opportunity to explain its absence. Where the IJ breaches such rules, we generally do not reject the IJ's findings outright, because, despite the errors, it is true in most cases that a reasonable fact-finder would not be compelled to reach an opposite conclusion.[1] However, we do not ordinarily deny the petition for review because we cannot determine whether the IJ would have reached the same conclusion had she not erred. In these instances, we vacate and remand for further proceedings conducted in accord with the opinion. However, as we explain in this opinion, implicit in the rationale for remanding when an adjudicatory error leaves us uncertain as to whether the IJ or BIA would have reached the same conclusion absent the identified error or errors, is the corollary proposition that we will deny the petition for review rather than remand where (1) the adjudicator explicitly rested its conclusion on alternative grounds, one of which is sustainable; (2) the adjudicator relied so little on the error-infected aspect of its reasoning, that there is no realistic possibility of a different result on remand; or (3) the evidence so overwhelmingly supports the IJ's finding that, notwithstanding identified errors, there is no realistic possibility of a different result on remand.

■ Application of these principles requires us to (1) defer to the IJ's fact-finding and affirm when the fact-finding is based on specific and cogent reasons not infected by legal error; (2) remand where identified errors leave us in doubt whether the IJ would have reached the same result absent the errors; (3) affirm, despite IJ errors, when we can confidently predict

that the IJ would necessarily reach the same result absent errors; and (4) grant the petition only in those extremely rare instances where substantial evidence does not exist to support the IJ's decision. Because the IJ, in judging Cao's credibility and in finding his proof insufficient, made significant errors and we do not know what her findings would have been absent these errors, we remand for further development of some, but not all of, Cao's claims.

## BACKGROUND

Cao, a citizen of the People's Republic of China ("China"), illegally entered this country in November 1997. He was promptly arrested and ordered to appear for a removal proceeding. Cao conceded that he was removable but filed an application for asylum and withholding of removal, in which he claimed he had been threatened or persecuted on the basis of his political opinion.

### *Allegations in the Sworn Asylum Application*

In an accompanying statement, sworn to under penalty of perjury, Cao alleged that he married his wife, Hui Yun Lin, in May 1996 when she was 21. Governmental birth planning personnel told Lin that she had to be over 23 to obtain permission to have a child. Further, Lin was instructed to report for a pregnancy test every four months. If she were found to be pregnant, she would be forced to undergo an abortion.

Although Cao and Lin used birth control, she became pregnant in 1997. With

---

1. Reversal is also rare because, as we have said, determining whether an applicant should receive asylum or withholding of removal ordinarily involves judgment of the applicant's credibility, a task best performed by the IJ who actually observes the applicant and listens to his testimony. *See Zhang v. United States INS,* 386 F.3d 66, 73–74 (2d Cir.2004) (describing the limited role we play in reviewing credibility findings).

the time for a pregnancy test fast approaching, the two went into hiding. Cao explained, "My wife and I did not want to let the Birth Planning Personnel harm this innocent life. God, Jesus would not let us do so either."

On July 4, 1997, after Cao and Lin had left their home, birth planning personnel came to their house with a notice asking for Lin. Later the birth planning personnel contacted Cao's work unit. Thereafter, Cao's unit leader "notified [Cao's] house and ordered [Cao] to bring [his] wife in to perform an abortion before August 15th." When Cao did not comply, his unit discharged him.

Subsequently, "the Birth Planning Personnel came to [Cao's] house again and forcibly detained [his] mother and threaten[ed] [his] wife to come back to have an abortion." Cao's father negotiated with the officials and paid money to have Cao's mother released.

### Documentary Evidence

On October 13, 1999, Cao appeared before IJ Theresa Holmes–Simmons to offer proof in support of his application. In addition to his oral testimony, which we describe below, Cao submitted several documents, including (1) a marriage certificate issued for Cao and Lin on May 16, 1996; (2) his employee's identification card; (3) baptism certificates purportedly for his wife and daughter, both showing baptism on November 19, 1998; (4) a child-bearing-age-woman's examination certificate for his wife showing that her last pregnancy exam occurred on March 4, 1997, and stating that she was not pregnant at that time; (5) an August 15, 1997, notice from Cao's work unit stating, "[s]ince comrade Cao, HeLing's wife refused to have an abortion, the factory has decided to remove his name from the rolls after discussion"; (6) a receipt dated August 25, 1999, for a birth

control fine of five thousand yuan; (7) notarial certificates for Cao's daughter's birth, his birth, and his wife's birth; and (8) Congressional testimony from and the transcript of a television interview with a former birth control official in Cao's home province. Cao's sworn asylum application was also accepted for the record.

### Cao's Explanation of How His Daughter's Birth Certificate was Obtained

Because Cao's daughter's notarial birth certificate played an important role in the IJ's findings, we begin our summary of Cao's hearing testimony by setting out his explanation of how that document was obtained. Cao testified that he received his daughter's notarial birth certificate, which was dated September 27, 1999, from his father and that his wife had obtained the certificate after listing Cao's daughter on the household registration on August 25, 1999. Lin delayed placing her daughter on the household registration to avoid paying the family planning fine due because she had the child before she turned twenty-three. According to Cao, Lin ultimately paid the fine enabling her to place the child on the household registration and the child to attend school. The addition of the child to the household registration also required Lin to furnish a hospital certificate, which she did not have because the baby was not born in a hospital. Lin overcame this problem when her midwife verified the birth to a hospital, which then issued a certificate. With the hospital certificate in hand and the fine paid, Lin was able to add the baby to the household register. The hospital certificate and attestations of the birth from Cao's aunt and the midwife allowed issuance of the notarial certificate.

### Cao's Testimony on the Merits

On the merits of his claim, Cao testified that he married Lin on May 16, 1996, and

that they had one daughter born February 26, 1998. Cao also testified that he and his wife left their home after July 4, 1997, when—while Lin was pregnant—she received a notice to report for a pregnancy examination, but that his last day of work was July 1, 1997. The couple hid with Cao's aunt until September 1997. During that period, Cao's father told Cao that, on August 5, 1997, the leader of Cao's work unit had called to say Lin must report for an abortion. Because Lin did not comply, Cao's work unit terminated him on August 15, 1997. Cao left China in September 1997 when Lin was four months pregnant.

Cao claimed that, because he worked for a national manufacturer, he would have only been allowed one child had he remained in China. He testified that he and his wife wanted other children and that they were Catholic. Because his wife had violated the age-of-birth policy and they already had one child, Cao explained that either he or his wife would be forcibly sterilized if he returned to China. However, as long as he was not in China, his wife would not be subjected to sterilization. Asked why he had left before his wife gave birth, Cao explained: "For, for leaving China, it's not that the time that they, I could choose. I had the opportunity and I have arranged my wife staying with my aunt, so I feel she's safe. I left." He explained that he left China because "[a]t that time, I had so much trouble in China and I had no future, was mistreated. And I heard in the United States everybody get freedom." He also explained that his wife did not come because her pregnancy made it unsafe for her to make the journey. Cao admitted that he had never been beaten, tortured, or detained and that neither he nor his wife had received a sterilization notice.

The IJ denied Cao's applications for asylum, withholding of removal, and CAT re-lief. She acknowledged that opposition to China's birth control policies is a species of political opinion that can support an otherwise proper asylum application and that an applicant can rely on his spouse's subjection to a forced abortion or sterilization. However, she did not find Cao's testimony credible. Instead, she "f[ound] that [his] testimony [was] implausible at many points, inconsistent, and lacking in details, and at many times has been unresponsive."

While the IJ did not indicate where Cao's testimony should have been more detailed, where it was inconsistent, or where it was unresponsive, she found it to be implausible and/or insufficient for several reasons. First, she reasoned that if Cao had been truly worried about his wife being subjected to a forced abortion or sterilization, he would not have left China when she was only four months pregnant.

Second, she did not credit Cao's claim that he had been fired because his wife refused to undergo an abortion, finding instead that he "was probably fired because he did not go to work for an entire month." In part, this finding was premised on the IJ's conclusion that it made no sense that Cao did not appear at work after July 1, before he knew of either the notice to appear for an examination or the order to undergo an abortion. She gave little or no weight to the notice of his firing because it was not properly authenticated. She also noted that he produced no written documentation that his wife had been ordered to undergo an abortion.

Third, the IJ was not satisfied that Cao "even has a daughter." She was not persuaded by the notarial birth certificate because it was not contemporaneous and it was unauthenticated. In fact, she found that it was not entitled to any weight. She also found "respondent's story about how this notarial was obtained [to be] implausi-

ble" because he had not produced the certificate the midwife allegedly obtained from the hospital and because she did not believe a midwife could simply go to a hospital, say a child was born, and get a certificate.

Finally, the IJ also appears to have found Cao's testimony incredible because it was inconsistent with the State Department's report of conditions in China. That report, she said, indicated that (1) if a first child were female, a couple would usually be allowed to have a second child and (2) underage pregnancies did not usually result in forced abortions or sterilizations in Fujian province, where Cao and Lin lived.

Based on these predicate findings as well as Cao's admission that his wife's life was currently not bad, the IJ found that Cao had not established that either he or his wife had undergone past persecution. She also held that imposition of a fine, assuming one was levied, was not persecution. In passing, the IJ noted that Cao had claimed he was Catholic but found that he had not offered any proof that he and his wife were subjected to persecution on that basis.

To the extent that Cao premised his claim that he would likely be subject to future persecution on his desire and that of his wife to have more children, the IJ found his testimony to be speculative, noting that she could not even ascertain whether Lin could have more children. She did not explicitly rule on Cao's claim that either he or his wife would be sterilized if he returned to China.

Summing up, the IJ found that Cao was ineligible for asylum because he had "not established that he has suffered past persecution or that he has a likelihood of

future persecution." She explained: "By offering a claim which is vague, inconsistent, no[t] supported by the documents, or by any background material, the Court finds the respondent has not met his burden." She held that Cao also "failed to meet the higher standard of a clear probability of persecution which is required for withholding of removal to the People's Republic of China." Finally, she found that Cao was not eligible for CAT relief because he did not establish "that it is more likely than not that he would be subject to torture if returned." She therefore ordered Cao removed to China.

The BIA affirmed without opinion, and Cao petitioned for review pursuant to 8 U.S.C. § 1252, *amended by* Real ID Act of 2005, Pub. L No. 104–13, 119 Stat. 231.[2] He contends that the IJ violated longstanding rules in evaluating his testimony and documentary evidence and erred in each of her conclusions.

## DISCUSSION

### I. Substantive standards: asylum, withholding of removal, and CAT relief.

"To establish eligibility for asylum, a petitioner must show that he is a 'refugee' within the meaning of the Immigration and Nationality Act, i.e., that he has suffered past persecution on account of 'race, religion, nationality, membership in a particular social group, or political opinion,' or that he has a well-founded fear of future persecution on these grounds." *Qiu v. Ashcroft,* 329 F.3d 140, 148 (2d Cir.2003) (quoting 8 U.S.C. § 1101(a)(42)). "[A] person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for

---

**2.** Neither party contends that these amendments would affect Cao's claim, and we see

no basis for holding that they do.

failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion." 8 U.S.C. § 1101(a)(42). BIA precedent allows a male applicant to stand in the shoes of his wife and apply for asylum based on her sterilization or abortion. *Qiu,* 329 F.3d at 148 (citing *C–Y–Z–,* 21 I. & N. Dec. 915 (B.I.A.1997)).

"A showing of past persecution sets up a rebuttable presumption of a well-founded fear of future persecution" which can be overcome by a showing, by the preponderance of the evidence, that conditions in the applicant's country of nationality have changed sufficiently to destroy the basis for the presumption. *Qiu,* 329 F.3d at 148. Absent past persecution, establishing a well founded fear of future persecution requires both a subjective and an objective showing. *Ramsameachire v. Ashcroft,* 357 F.3d 169, 178 (2d Cir.2004). The subjective element can be satisfied by the applicant's credible testimony concerning his fear. *Id.* The objective component, however, "is largely dependent upon the context and believability [the applicant] can establish for [his or her] claims through presentation of reliable, specific, objective supporting evidence." *Id.*

An applicant for withholding of removal must demonstrate "that it is more likely than not that, were he deported, his 'life or freedom would be threatened' on account of one of the privileged grounds mentioned above." *Qiu,* 329 F.3d at 148 (quoting 8 U.S.C. § 1231(b)(3)(A)). However, once this showing is made, withholding of removal is mandatory while INS may still exercise its discretion to refuse asylum to an eligible applicant. *Zhang v.*

*United States INS,* 386 F.3d 66, 70–71 (2d Cir.2004) ("*Zhang–INS* "). Forced sterilization or abortion threatens the applicant's life or freedom and is a basis for withholding removal assuming that the government cannot establish changed country conditions. *Qiu,* 329 F.3d at 148 (citing *C–Y–Z–,* 21 I. & N. Dec. 915). "Because [withholding of removal and asylum] are factually related but with a heavier burden for withholding, it follows that an applicant who fails to establish his eligibility for asylum necessarily fails to establish eligibility for withholding." *Zhang–INS,* 386 F.3d at 71.

To obtain relief—in the form of withholding of removal—under CAT, the applicant must show that it is more likely than not he would be tortured if returned to his country of origin. *See* 8 C.F.R. § 208.16(c)(2). Torture is "the intentional infliction of pain or suffering that is perpetrated or sanctioned by a nation's authorities." *Ramsameachire,* 357 F.3d at 184. Because CAT relief does not require a credible subjective belief that torture will occur, the IJ must consider an applicant's CAT claim despite a negative credibility finding on the asylum and withholding-of-removal claims provided, of course, that there is a basis independent of the credibility finding for the CAT claim. *See id.* at 184–85.

## II. Standard of review and evidentiary principles.

The BIA did not accord plenary review to the IJ's decision. Instead, one member of the board held: "The Board affirms, without opinion, the results of the decision below. The decision below is, therefore, the final agency determination. *See* 8 C.F.R. § 3.1(e)(4)."[3] Because this expe-

---

**3.** Section 3.1(e)(4) has been redesignated as 8 C.F.R. § 1003.1(e)(4). Reorganization of

Regulations, 68 Fed.Reg. 9824, 9830 (Feb. 28, 2003). It allows abbreviated review and pro-

dited procedure was used, we review the IJ's decision. *Zhang v. United States DOJ.*, 362 F.3d 155, 159 (2d Cir.2004) ("*Zhang–DOJ* ").

We adhere to a number of general principles in reviewing the IJ's credibility and sufficiency determinations. First, we will limit our review of the IJ's decision to the reasons she actually articulates and ordinarily will not affirm based on evidence that may appear in the record but that was not relied on in the IJ's decision because we cannot know how the IJ would have viewed evidence she did not analyze. *See Secaida–Rosales v. INS*, 331 F.3d 297, 305 (2d Cir.2003). To assume a hypothetical basis for the IJ's determination, even one based in the record, would usurp her role. *See generally, e.g., SEC v. Chenery*, 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626 (1943) ("For purposes of affirming no less than reversing its orders, an appellate court cannot intrude upon the domain which Congress has exclusively entrusted to an administrative agency.")

▮▮▮ Second, those findings that the IJ actually made "are conclusive unless a reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(a)(4)(B). The Supreme Court has stated that evidence that would compel a contrary conclusion indicates a lack of substantial evidence in support of an IJ's findings. *INS v. Elias–Zacarias*, 502 U.S. 478, 481 & n. 1, 112 S.Ct. 812, 117 L.Ed.2d 38. Where a factual determination rests on a credibility finding, the court "afford[s] particular deference in applying the substantial evidence standard." *Zhang–INS*, 386 F.3d at 73 (internal quotation marks omitted). However, "the fact that the [IJ] has relied primarily on credibility grounds in dismissing an asylum application cannot

insulate the decision from review." *Ramsameachire*, 357 F.3d at 178. In fact, "using an inappropriately stringent standard when evaluating an applicant's testimony constitutes *legal*, not factual error," *Secaida–Rosales*, 331 F.3d at 307, and we review de novo whether such a standard has been used.

Third, in order to merit substantial evidence deference, "[t]he [IJ] must give specific, cogent reasons for rejecting the petitioner's testimony," and an adverse credibility determination may not be based upon speculation or upon an incorrect analysis of the testimony. *Ramsameachire*, 357 F.3d at 178; *see also Secaida–Rosales*, 331 F.3d at 307. Further, the IJ's reasons "must bear a legitimate nexus to the finding." *Secaida–Rosales*, 331 F.3d at 307. "[W]hen a credibility determination analyzing testimony is based on flawed reasoning, it will not satisfy the substantial evidence standard." *Id.*

Fourth, the IJ must consider all the evidence in the record that has probative value. *See Qiu*, 329 F.3d at 149 (holding that each portion of the evidence tending to support an aspect of a claim must be considered unless it is "too insignificant to merit discussion").

▮▮▮ Fifth, the IJ can dismiss an applicant's testimony as too vague to satisfy his burden only if it does not "identify facts corresponding to each of the elements of one of the refugee categories of the immigration statutes." *Id.* at 151 (internal quotation marks omitted). If an applicant satisfies this burden, but his testimony is "spare," "the IJ and counsel for the INS may wish to probe for incidental details, seeking to draw out inconsistencies that

vides the quoted format for a BIA decision by one member of the board made without plenary review. 8 C.F.R. § 1003.1(e)(4).

would support a finding of lack of credibility." *Id.* at 152.

Sixth, certain principles limit both the applicant's ability to succeed without offering corroborative evidence and the IJ's ability to demand such evidence. Although an applicant can in some cases satisfy his burden of proof with his own testimony, "where the circumstances indicate that an applicant has, or with reasonable effort could gain, access to relevant corroborating evidence, his failure to produce such evidence in support of his claim is a factor that may be weighed in considering whether he has satisfied the burden of proof." *Zhang–INS,* 386 F.3d at 71. However, where the applicant has furnished credible corroborating evidence to confirm his testimony, the IJ may not reject his testimony because he did not furnish additional evidence. *Secaida–Rosales,* 331 F.3d at 311–12. "[T]o turn down a refugee candidate for want of sufficient corroboration, the adjudicator must (a) identify the particular pieces of missing, relevant documentation, and (b) show that the documentation at issue was reasonably available to the petitioner." *Qiu,* 329 F.3d at 153. The IJ must also assess the applicant's reasons for not furnishing the corroboration at issue. *See Diallo v. INS,* 232 F.3d 279, 289 (2d Cir.2000).

Although we will reject an IJ's findings of fact only if no reasonable fact-finder could find that the petitioner was not entitled to asylum, withholding of removal, or CAT relief, *Ramsameachire,* 357 F.3d at 177, serious legal errors of the sort that we have described will ordinarily require vacatur and remand for a new assessment of the evidence and/or a new hearing, *Qiu,* 329 F.3d at 149; *see generally Chenery,* 318 U.S. at 88, 92–95, 63 S.Ct. 454 (explaining that a reviewing court should not rest its affirmance on a basis not set forth in an administrative decision because to do

so would usurp the function of the administrative adjudicator). When we direct a remand of this sort we do not pass "on the sufficiency of [petitioner's] evidence in support of his application." *Chen v. INS,* 359 F.3d 121, 129 (2d Cir.2004); *see also Qiu,* 329 F.3d at 149.

Our cases implicitly recognize, however, that not every minor error requires a remand. Certainly if the IJ explicitly adopts an alternative and sufficient basis for her determination, no remand is required *See, e.g., Zhang–INS,* 386 F.3d at 78–79 (finding that even if the administrative adjudicator's demand for corroborating documents was improper, remand was not required because the adjudicator had independently, that is, not because of the lack of documentation, found the applicant incredible). Thus, our responsibility to examine the IJ's reasoning and her analysis does not require that we remand based on an error when the IJ also rests her determination on an acceptable independent basis.

We also believe that we are not required to remand where there is no realistic possibility that, absent the errors, the IJ or BIA would have reached a different conclusion. Although we have found no decision from this court expressly articulating this principle in the context of asylum, administrative law cases from both the Supreme Court and our court strongly suggest that we should disregard errors in this context. *See NLRB v. Wyman–Gordon Co.,* 394 U.S. 759, 766 n. 6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) (stating that *"Chenery* does not require that we convert judicial review of agency action into a ping-pong game" and that remand is not required when it "would be an idle and useless formality"); *Massachusetts Trustees of E. Gas & Fuel Assocs. v. United States,* 377 U.S. 235, 246–48, 84 S.Ct. 1236, 12 L.Ed.2d 268 (1964) (holding that *Chen-*

*ery* does not require a remand where it is clear that any arguable error would not have made a difference in the agency determination); *NLRB v. American Geri–Care, Inc.*, 697 F.2d 56, 64 (2d Cir.1982) ("[R]eversal and remand are [not] required each and every time an administrative agency assigns a wrong reason for its action; rather [remand is required] *only* where there is a significant chance that but for the error, the agency might have reached a different result."); *cf. Ewing v. NLRB*, 768 F.2d 51, 56 (2d Cir.1985) (concluding that *Chenery* required a remand because "[t]his ... is not a case in which all doubt as to how the Board will decide the case on remand has been eliminated").

The futility of a remand would support affirming despite legal error and despite the policy of allowing the administrative adjudicator to assess the impact of identified legal error on its credibility and sufficiency findings in at least two circumstances: First, remand may not be required where the IJ or BIA's reliance on an erroneous aspect of its reasoning is so tangential that there is no realistic possibility that the outcome would be different on remand. *Cf. Pfizer, Inc. v. Richardson*, 434 F.2d 536, 547 n. 21 (2d Cir.1970) (holding that, where it was clear that consideration of a factor that the agency erroneously failed to consider in its original determination would not alter the result, a remand was not required). Second, we believe that remand should not be required where—notwithstanding admitted errors—overwhelming evidence supporting the administrative adjudicator's findings makes it clear that the same decision would have been reached in the absence of the errors.

*See American Geri–Care*, 697 F.2d at 63–64.

### III. The IJ's evaluation of Cao's credibility and the sufficiency of his proof.

We review the IJ's decision in this case keeping in mind both the requirements for reviewing an administrative adjudication and the principles that govern our disposition, that is the choice of granting, denying, or remanding the petition.

#### A. Asylum—Birth Control Policy

Although the IJ used boiler-plate language concluding that Cao's testimony was vague, internally inconsistent, and, at times unresponsive, she described no specific testimony that should have been more detailed, was inconsistent with other testimony, or was unresponsive to questions asked. In fact, Cao's testimony was reasonably detailed and internally consistent in its important aspects. Thus, the IJ's determination stands or falls on her conclusions that Cao's account was implausible, inconsistent with a State Department report, and, in some instances, unsupported by documentation.[4]

We consider first the IJ's analysis of the credibility of Cao's overall account. She identified two reasons for finding incredible Cao's claims that he and Lin had been subjected to persecution and that he feared future persecution. First, she found Cao's account implausible, positing that he would not have left China if he truly feared his wife was in danger of having to undergo an abortion or of being sterilized. However, Cao explained why he believed his wife would be safer if he left China. He testified that (1) he be-

---

4. We do not imply that the IJ could not on remand identify inconsistencies in Cao's testimony or inconsistencies between his testimony and written statements that would support an adverse credibility determination.

lieved he had ensured his wife's safety by hiding her with his aunt and (2) he believed she would have a better chance of avoiding sterilization if he were out of the country. He also claimed that it was not safe for Lin to flee China while she was pregnant.

Although the IJ was not required to credit Cao's explanations even if they appear plausible on a cold record—after all assessing credibility is one of the IJ's key responsibilities—she was required to take those explanations into account as significant factual assertions supporting Cao's claim. *See Qiu,* 329 F.3d at 149–50; *cf. Diallo,* 232 F.3d at 289 (holding that an adjudicator must evaluate an asylum applicant's reasons for failing to furnish corroborating evidence). Absent a reasoned evaluation of Cao's explanations, the IJ's conclusion that his story is implausible was based on flawed reasoning and, therefore, cannot constitute substantial evidence supporting her conclusion. *See Secaida–Rosales,* 331 F.3d at 307.

Second, the IJ found that Cao's testimony was not consistent with the State Department's assessment of conditions in China as presented in BUREAU OF DEMOCRACY, HUMAN RIGHTS AND LABOR, UNITED STATES DEPARTMENT OF STATE, CHINA: PROFILE OF ASYLUM CLAIMS AND COUNTRY CONDITIONS (April 14, 1998) ("China Profile"). She relied on the report's conclusion that if a first child born in Cao's province were female, the couple would be allowed to have a second child. The IJ further noted the report's conclusion that forced abortions or sterilizations were not usually required when a woman became pregnant before the legal birth age. The IJ acknowledged that Cao had submitted additional background material but stated that it did "not outweigh the weight given to the China Profile." She did not explain

why she credited the China Profile over Cao's materials or discuss those materials.

Cao's materials included Congressional testimony from and an interview with Gao Xiao Duan, a former administrator of a planned birth office in Fujian Province. Fujian is the province in which Cao and Lin lived. Gao testified that cadres in that province engaged in night raids, and that, if they could not apprehend a pregnant woman, they would detain relatives to force the woman to surrender. Once a woman surrendered, Gao claimed, the woman would be required to submit to an abortion or sterilization. Further, women were not allowed to be pregnant unless they had obtained a certificate allowing pregnancy. If a woman was found to be pregnant and did not have a certificate, an abortion was performed immediately. Sterilization was also required on occasion. Gao also testified that she herself was not allowed to have a second child after giving birth to a girl.

Gao's personal knowledge, the detail in her account, and the equivocation in the China Profile, which is largely based on hearsay accounts of Chinese officials, indicate that the IJ should have given an explanation for crediting the China Profile over Gao's testimony. *See Secaida–Rosales,* 331 F.3d at 307; *see also Chen,* 359 F.3d at 130. We have cautioned that "the immigration court should be careful not to place excessive reliance on published reports of the Department of State." *Chen,* 359 F.3d 121, 130 (2d Cir.2004). While the IJ is entitled to consider the reports, she must also "consider ... any contrary or countervailing evidence ... as well as the particular circumstances of the applicant's case." *Id.* The fact-finder should not "assume that a report produced by the State Department—an agency of the Executive Branch of Government that is necessarily bound to be concerned to avoid abrading

relations with other countries ... present the most accurate pictures of human rights in the country at issue." *Id.* Because the IJ did not adhere to these principles, we cannot hold that the China Profile constitutes substantial evidence in support of her credibility finding. *See Secaida–Rosales,* 331 F.3d at 307.

However, our task does not end with this review of the IJ's two general bases for discounting Cao's credibility. The IJ also made four specific findings: (1) Cao failed to establish he had a daughter; (2) Cao did not establish that his wife received a forced abortion notice; (3) Cao's testimony that he had been fired from his job because of his wife's refusal to have an abortion was not credible; and (4) Cao admitted that his wife's life was not bad now. With respect to several of these findings, the IJ considered both credibility and sufficiency (corroboration). Because we have already determined that the IJ's principal reasons for generally discounting Cao's credibility are seriously flawed, we now consider, with respect to the more particularized findings, both the IJ's credibility analysis and her findings that additional corroboration should have been furnished. *Cf. Zhang–INS,* 386 F.3d at 78 (holding that if an administrative adjudicator independently finds that an applicant lacks credibility, errors in requiring corroboration do not require remand).

■ In reviewing these subsidiary findings, we find that each one is flawed. The finding that Cao failed to establish that he had a daughter was, according to the IJ, supported by (1) petitioner's failure to supply a contemporaneous and authenticated certificate of birth; (2) petitioner's failure to supply the certificate that the midwife allegedly obtained from the hospital; and (3) the implausibility of Cao's testimony that the midwife was able to obtain a certificate from a hospital where the baby was not born based solely on her claim that a baby had been born. The IJ held that "respondent's documents, which do attempt to establish the existence of this child, are not documents, [that] can be given any weight" because they are not contemporaneous and not authenticated.

Cao explained why the birth certificate was not contemporaneous: his wife delayed requesting a certificate and a change in the household register because she did not want to incur a fine. Although this testimony was buttressed by the receipt for the fine, which was dated during the time period in which Lin added the baby to the household registration, the IJ did not explain why she discredited Cao's explanation. Without ruling on the credibility of Cao's explanation, the IJ should not have relied on the fact that the certificate was not contemporaneous. *See Diallo,* 232 F.3d at 289 (requiring the IJ to consider the believability of an applicant's explanation for failing to furnish documentation).

It is not entirely clear what the IJ believed should have been done to authenticate the birth certificate. She complained that the certificate was not "properly authenticated as required by regulation," but did not identify the governing regulation. We assume that the IJ was referring to 8 C.F.R. § 287.6, a regulation that provides for (1) the authentication of certain foreign official records by both the home country and the United States Foreign Service, and (2) the authentication of other documents by the home country alone. The Third Circuit has held that "§ 287.6 ... is not the exclusive means of authenticating records before an immigration judge" in part, because "asylum applicants can not always reasonably be expected to have an authenticated document from an alleged persecutor." *Gui Cun Liu v. Ashcroft,* 372 F.3d 529, 532 (3d Cir.2004) (internal quotation marks omitted); *see also Abank-*

*wah v. INS,* 185 F.3d 18, 26 (2d Cir.1999) ("[I]t must be acknowledged that a genuine refugee does not flee her native country armed with affidavits, expert witnesses, and extensive documentation."). It appears that the BIA agrees. *See C–Y–Z,* 21 I. & N. Dec. at 918 (discussing INS argument for rejection of applicant's position because his documents were not authenticated), 920 (granting petition and thus implicitly rejecting absolute authentication requirement). We, too, agree, and find that the IJ erred by rejecting the notarial birth certificate based on Cao's failure to authenticate it pursuant to "regulation."

The judge also held that Cao's testimony was implausible and/or insufficient because he did not produce the hospital certificate; however, she did not ask him why he did not offer it. While we likely would not vacate on this basis alone, we note that an IJ has an obligation to ensure that documentation is available before relying on the applicant's failure to produce it. *See Qiu,* 329 F.3d at 153.

Without some specific evidence concerning practices in China, the IJ's conclusion that Lin's midwife could not have obtained a hospital certificate based solely on her word is speculative. *See Ramsameachire,* 357 F.3d at 178. In a domestic case, it might well be acceptable to infer that hospital personnel who had not witnessed a birth would not issue a birth certificate. However, the plausibility of this inference rests on known practices concerning the issuance of birth certificates in the United States. That basis is lacking here. We have no knowledge about the documentation required in China, and the record does not reflect that the IJ knew anything about documentation practices in China. We have previously cautioned that IJs must "back [ ] demands for corroborative evidence with a reasoned explanation ...

that responds to evidence of actual conditions in the asylum-seeker's former country of residence" because such an explanation "constitutes one small, but crucial, defense against potentially mistaken, culturally biased assumptions about the existence and availability of documents." *Qiu,* 329 F.3d at 154. For substantially the same reasons, we now hold that, absent record evidence of practices in foreign countries, the IJ must not speculate as to the existence or nature of such practices.

 The IJ did not credit Cao's testimony that his wife was told she must undergo an abortion because he produced no written documentation. The IJ seemingly relied on Cao's failure to produce a copy of an abortion notice. If we are interpreting the decision properly, the IJ mischaracterized the record and engaged in speculation. There is no evidence in the record that forced abortions are usually triggered by a written notice. Therefore, the IJ's conclusion that Cao did not carry his burden of demonstrating that an abortion was threatened is impermissibly speculative. *See Qiu,* 329 F.3d at 153. More salient, the IJ completely fails to contend with Cao's testimony that the notice was by telephone. This too was error because the IJ must consider the whole record. *See id.* at 149.

 The IJ found that Cao had not established that he was fired from his job due to his wife's refusal to have an abortion because (1) he likely was fired as a result of his long absence; (2) the termination letter he produced was "not properly authenticated, as required by statute, and the Court gives it little or no weight"; and (3) the sequence of events was implausible, that is, Cao did not work after July 1 although the notice to report for a pregnancy exam came on July 4, and the notice to be aborted did not come until August 5.

The first reason is speculative, and the second—the failure to produce authenticated documents—fails for the reasons we have already discussed. In the case of Cao's termination notice, the IJ's reliance on a failure to authenticate by a particular procedure is even more problematic than it normally is because 8 C.F.R. § 287.6 covers only official records and public documents.

The IJ's reliance on the sequence of events is more justified. The IJ could permissibly have inferred that Cao had no reason to hide until Lin received the notice to report for a pregnancy exam. We note, however, that Cao knew that Lin was pregnant and, based on the timing of the last pregnancy exam, March 4, 1997, and the four-month schedule for exams, Cao and Lin must have known that another exam was imminent. The two also knew that Lin was too young to be allowed to complete her pregnancy. Thus, the short delay between Cao and Lin going into hiding and the purported issuance of the pregnancy exam notice provides only minimal support for rejecting Cao's testimony. Even if the IJ's finding as to the sequence of events is correct, we cannot determine how much weight she accorded to this fact as compared to the other two stated reasons that were the basis for her rejection of Cao's testimony about his job termination. Accordingly we remand for clarification of these findings.

█ Finally, the IJ relied on Cao's testimony that his wife's life was not currently too bad to dismiss Cao's testimony that he had suffered past persecution or was likely to suffer future persecution. That reliance was misplaced because the IJ ignored the testimony's context and thereby misstated its significance. Cao testified that his wife was not in much danger now because he had left China, "[b]ut if I return, either one of us has to get sterilized." The IJ's failure to review evidence in the context of the whole record was error. *Qiu*, 329 F.3d at 149–50.

We come now to the point where we must assess the impact of the IJ's errors on our disposition. We will not reject outright the IJ's conclusion that Cao failed to establish past persecution because we cannot conclude that a reasonable fact-finder would have to find that Cao made the requisite showing. However, the IJ relied on speculation, failed to consider all of the significant evidence, and appeared to place undue reliance on the fact that Cao's documents were not authenticated pursuant to regulation. Applying the futility exception that we discussed above at [401–02], we find that the erroneous aspects of the IJ's reasoning are not tangential to the findings she made and that the evidence supporting her findings is not so overwhelming that it is clear she would reach the same results on remand. We therefore vacate and remand to the BIA for remand to the IJ for further proceedings consistent with this opinion.

If, on remand, the IJ determines that Cao was subjected to past persecution,[5] the statutory presumption of a likelihood of future persecution will be triggered, and the IJ should evaluate any evidence of changed country conditions. *See Qiu*, 329 F.3d at 148. Assuming that the IJ does not

---

5. The IJ also held that a fine alone would not constitute persecution even if Cao's testimony on this point were credible. Of course, Cao also claimed that he was fired because Lin failed to report for an abortion. On remand, the IJ should apply the credibility standards we have discussed in this opinion to consider any evidence of economic retaliation against Cao or Lin in light of our recognition that "deliberate imposition of a substantial economic disadvantage" may demonstrate persecution. *Guan Shan Liao v. United States Dep't of Justice*, 293 F.3d 61, 70 (2d Cir.2002).

find past persecution, she must assess any other evidence of the likelihood of future persecution. In the hearing decision under review, the IJ found only that, to the extent Cao relied on measures that might be taken against him in the event he and his wife attempted to have another child, his testimony was speculative. She did not address Cao's claim that either he or his wife would be sterilized if he returned to China. On remand, the IJ should explicitly rule on this claim.

### B. Asylum—Religion

Respondents claim that Cao's religious persecution claim is barred for failure to exhaust his remedies. Even if it is not, the IJ correctly determined the claim on the merits. Cao offered no evidence that he was persecuted on the basis of his religion. On appeal, he argues that because he and his wife are Catholic, it is self-evident that they are opposed to abortion. This correlation does not mean that Cao was prosecuted because he was Catholic. He points to no evidence that the birth control policy is applied with special vigor against Catholics or that authorities even knew he was Catholic. Therefore, he offered no evidence from which a reasonable fact-finder could conclude that he was eligible for asylum on religious grounds, and we affirm the IJ's determination.

### C. Asylum—Illegal Departure.

Cao also claims, for the first time on appeal, that the IJ erred by failing to consider that his illegal departure from China could, in itself, be a basis for an asylum claim. Chinese law does indeed allow for imposition of a sentence of imprisonment on a person who illegally departs the country. *See Yang v. McElroy,* 277 F.3d 158, 161 n. 2 (2d Cir.2002). However, we need not determine whether this imprisonment would constitute persecution *on a prohibited basis* because Cao did not raise this claim before the IJ and therefore has not exhausted his administrative remedies. His failure bars consideration of his claim. *See Cervantes–Ascencio v. United States INS,* 326 F.3d 83, 87 (2d Cir.2003) (citing 8 U.S.C. § 1252(d)(1)).

### D. Withholding of Removal

As noted, withholding of removal requires that the applicant show "that it is more likely than not that, were he deported, his life or freedom would be threatened." *Qiu,* 329 F.3d at 148 (internal quotation marks omitted). Demonstrating that it is more likely than not that an applicant would be sterilized suffices. *Id.* The IJ conducted no particularized analysis on this issue because an applicant who cannot meet the standard for asylum, by definition, cannot meet the higher standard for withholding of removal. Because we vacate and remand for further consideration the IJ's determination that Cao had not been subjected to past persecution and because the IJ made no credibility or sufficiency findings on Cao's claim that he would be sterilized, we remand on this issue as well.

### E. CAT

The standard for CAT relief is that the applicant more likely than not will be subjected to torture if he is returned to his native country. *Ramsameachire,* 357 F.3d at 184. Torture is defined as "the intentional infliction of pain or suffering ... perpetrated or sanctioned by a nation's authorities." *Id.* Cao's torture claim appears to rest on his belief that he will be sterilized if he returns to China. On remand, the IJ must determine in the first instance (1) whether it is more likely than not that Cao will be sterilized; and (2) if so, whether sterilization constitutes torture.

## CONCLUSION

For the reasons discussed, we affirm the IJ's finding on Cao's religious persecution claim; find that Cao failed to exhaust his administrative remedies on his claim that he will be imprisoned because he left the country illegally and therefore dismiss that claim; and otherwise vacate and remand to the BIA for remand to the IJ for further proceedings in conformance with this opinion.