**Balachandramoorthy SHYAMALAN,
Petitioner,**

v.

**Alberto R. GONZALES, Attorney
General of the United States,\*
Respondent.**

**No. 05–0040–ag.**

United States Court of Appeals,
Second Circuit.

Oct. 3, 2006.

---

\* Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Alberto R. Gonzales is automatically substituted for former Attorney General John Ashcroft as a respondent in this case.

Eric W. Schultz, Sacks, Kolken & Schultz, Buffalo, N.Y., for Petitioner.

Eric J. Glover, Asst. U.S. Atty., New Haven, Conn., for Respondent.

PRESENT: Hon. JON O. NEWMAN, Hon. JOSÉ A. CABRANES, Hon. ROSEMARY S. POOLER, Circuit Judges.

## SUMMARY ORDER

The petitioner, Balachandramoorthy Shyamalan, seeks review of an order by the Board of Immigration Appeals ("BIA") affirming the Immigration Judge's ("IJ's") order removing him as an alien smuggler pursuant to 8 U.S.C. § 1182(a)(6)(E)(I). Shyamalan claims that the IJ's decision was not based on substantial evidence and that the IJ should have suppressed an incriminating statement made by Shyamalan. The testimony at the hearing before the IJ revealed the following. Shyamalan, a citizen of Sri Lanka, came to the United States in 1984 as a student and later obtained H-1-B status. At the time of the events in question, the Immigration and Naturalization Service ("INS") had granted Shyamalan and his wife parole, although they have since been granted permanent residence. Shyamalan lives in New Jersey with his wife, a Canadian citizen, and his daughter, an American citizen.

Shyamalan and his family traveled to Toronto to attend a funeral on January 12, 2002. At the funeral, Shyamalan encountered Mathan Pathmanathan, whom he had allegedly met twice before. Pathmanathan asked Shyamalan for a ride to New Jersey to visit friends, and Shyamalan agreed. Before leaving, Shyamalan allegedly asked Pathmanathan whether he had a passport, and Pathmanathan indicated that he had a Canadian citizenship card in his bag. Shyamalan also asked Pathmanathan where he should drop him off, and Pathmanathan told him to drop him off at a bus stop or train station, from which he would make his way to his friends' place in Elizabeth, New Jersey.

At the Lewiston, New York port of entry, they were questioned by Officer Mary Everingham at the primary inspection booth. According to Everingham, Pathmanathan told her that Shyamalan and his wife were good friends of his and that he was going to visit them in New Jersey for a week; according to Shyamalan, however, Pathmanathan told her that he was going to visit "friends." Everingham referred the occupants to secondary inspection for processing of their parole forms and for additional questioning of Pathmanathan.

At secondary inspection, Pathmanathan was questioned by Officer Nghia Truong in the holding area. Pathmanathan initially maintained that he was going to the United States for a short visit. He gave Truong his wife's phone number for confirmation of his story. According to Truong, Pathmanathan's wife told him that Pathmanathan was working as a manager at a drug store in the United States, which Pathmanathan denied. Truong further testified that Shyamalan told Truong to contact a Mr. Robbie who could supply relevant information and supplied Mr. Robbie's phone number. Mr. Robbie confirmed that Pathmanathan was living and working in the United States.

After being confronted with the information obtained from his wife and Mr. Robbie, Pathmanathan admitted that he was living and working in the United States. He signed a sworn statement admitting that he was working illegally at Duane Reade Drug Store. The sworn statement initially contained no mention of Shyamalan. After Truong's supervisor instructed him to investigate the association between

Pathmanathan and Shyamalan, Truong asked Pathmanathan additional questions about Shyamalan and appended the answers to the sworn statement. According to the addendum, Shyamalan knew that Pathmanathan was living and working in the United States but did not know that he was doing so illegally. At the hearing, Pathmanathan testified that he did not say this but that he nevertheless signed the statement because Truong insisted that he sign it. Of particular significance for this petition for review, when asked at the IJ hearing whether Shyamalan "kn[e]w that you lived and worked in the United States," Pathmanathan answered, "No."

At secondary inspection, Everingham asked Shyamalan some questions about Pathmanathan to strengthen the case against Pathmanathan. Shyamalan insisted that Pathmanathan lived in Toronto and was just visiting the United States. At some point, Truong informed Shyamalan that he had learned that Pathmanathan was living and working illegally in the United States. According to Everingham, she advised Shyamalan of the consequences of not being truthful and told him that if he was found to have assisted Pathmanathan to enter the United States, he could be charged with alien smuggling. According to Shyamalan and his wife, however, Everingham became furious and threatened to prevent them from returning to New Jersey if they did not tell her that Pathmanathan was living and working illegally in the United States. Shyamalan eventually stated that he knew that Pathmanathan was living in the United States and working illegally at a pharmaceutical company. When asked why he had initially denied this knowledge, he said that he was scared about "what is to happen." He and his wife testified that he made up these answers so that Everingham would let them continue on to New Jersey. Shyamalan's wife was feeling ill, and their daughter was hungry.

Pathmanathan was determined to be inadmissible because he had sought admission to the United States by fraud and was ordered removed. Shyamalan and his wife were denied admission, and Shyamalan was issued a Notice to Appear charging him with alien smuggling under 8 U.S.C. § 1182(a)(6)(E)(I), rendering him subject to removal.

At a removal hearing on April 30, 2002, Shyamalan moved to suppress evidence of his incriminating statement, and called Pathmanathan, who testified that Shyamalan did not know of Pathmanathan's illegal status. The hearing was continued and resumed nearly a year later on April 3, 2003, at which time the remaining witnesses—Everingham, Truong, Shyamalan's wife, and Shyamalan—testified.

The IJ subsequently issued an oral decision ordering Shyamalan removed to Sri Lanka. The IJ summarized the testimony of Everingham, Truong, Shyamalan's wife, and Shyamalan, but did not mention the testimony of Pathmanathan given a year earlier. He found the immigration officers "credible and believable," and did not find Shyamalan or his wife credible. He concluded that Shyamalan "knowingly, intelligently, and voluntarily" gave the incriminating statement to Everingham and that the statement "demonstrate[d] by clear, unequivocal, and convincing evidence" that Shyamalan had knowingly smuggled Pathmanathan into the United States.

The BIA affirmed by summary order.

When the BIA affirms the IJ's decision by summary order, this Court reviews the IJ's decision directly. *Secaida–Rosales v. INS*, 331 F.3d 297, 305 (2d Cir.2003).

■ We first consider Shyamalan's claim that his incriminating statement was obtained coercively, in violation of 8 C.F.R. §§ 287.3(c), 287.8(c)(2)(vii) and the Fifth Amendment. The IJ found, based on his

credibility determinations, that the statement was made voluntarily and that the officers had acted appropriately in obtaining it. We see no basis for rejecting the IJ's ruling.

 Shyamalan's strongest argument is that the IJ's decision is flawed because the IJ failed to consider Pathmanathan's testimony. The IJ must "'consider all the evidence in the record that has probative value.'" *Xiao Ji Chen v. U.S. Dep't of Justice*, 434 F.3d 144, 163 (2d Cir.2006) (quoting *Cao He Lin v. U.S. Dep't of Justice*, 428 F.3d 391, 400 (2d Cir.2005)). Although a court will presume that an IJ has considered all the evidence "unless the record compellingly suggests otherwise," *id.* at 160 n. 13, the IJ's careful detailing of the testimony of the witnesses who testified in 2003 while not mentioning Pathmanathan's testimony given in 2002 strongly suggests that this significant testimony was overlooked. Since it was given a year before, it is entirely understandable that the IJ would not have had it in mind in making his decision.

When an IJ's decision omits facts "so fundamental to the claim" that the Court cannot determine whether the decision was based on substantial evidence, the Court may remand the case for further consideration. *Id.* at 158 (citing *Tian–Yong Chen v. INS*, 359 F.3d 121, 127 (2d Cir.2004)). Pathmanathan's testimony, if believed, exculpated Shyamalan of any knowledge that Pathmanathan was living or working in the United States. This testimony might not only have significantly bolstered Shyamalan's defense, but it might also have diminished the weight to be accorded to his own incriminating statement, even though that statement was reasonably found to be admissible.

Accordingly, we grant the petition and remand for further consideration.