Tatiana PAVLOVA, Petitioner,

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

Docket No. 03–4094–AG.

United States Court of Appeals, Second Circuit.

Argued: Jan. 31, 2006.

Decided: March 14, 2006.

Michael P. DiRaimondo (Marialaina L. Masi & Mary Elizabeth Delli–Pizzi, of

counsel), DiRaimondo & Masi, LLP, Melville, New York, for Petitioner.

Jim Letten, United States Attorney, Eastern District of Louisiana (Eneid A. Francis and Diane Hollenshead Copes, Assistant United States Attorneys, on the brief), New Orleans, Louisiana, for Respondent (on submission).

Before: CALABRESI, STRAUB, and WESLEY, Circuit Judges.

WESLEY, Circuit Judge.

Petitioner Tatiana Pavlova ("Pavlova"), a native and citizen of the Russian Federation, petitions for review of a December 17, 2002 order of the BIA, which summarily affirmed an IJ's July 30, 2001, decision denying her application for asylum, for withholding of removal under the Immigration and Nationality Act of 1952(INA), as amended, as well as for withholding of removal under the Convention Against Torture (CAT).[1] The IJ found Pavlova's account of religiously-motivated persecution to be incredible. He also concluded that, even if her story were credible, she did not qualify for the relief requested because the mistreatment she described lacked the government involvement necessary to constitute persecution within the meaning of the INA. Because the IJ's credibility finding rested on serious errors, and because he misstated the legal standard governing the level of government involvement needed to support a claim of persecution, we grant the petition for review, vacate the decision of the BIA, and remand the case to the BIA for further proceedings.

At her removal hearing, Pavlova testified that, as a member of the Baptist faith, she had been subjected to violence and threats by Russian National Unity ("RNU"), a Russian nationalist group founded and led by Alexandr Barkashov. According to Pavlova, the RNU's acts of aggression began in May 1994 when RNU members beat Pavlova and others for proselytizing in a public park. Although Pavlova reported this incident to the authorities, the RNU was apparently undeterred. As the proselytizing continued, so did the beatings. In early 1995, Pavlova was attacked while walking home from a prayer meeting. Later that year, Igor Nazim, a member of Pavlova's prayer group, died from injuries sustained in a similar attack.

In March 1996, Pavlova and her fellow Baptists founded a business, the purpose of which was to print and distribute religious literature. Over the next two years, the RNU waged a campaign of aggression to disrupt the operations of this business. The opening salvo in this violent campaign was apparently aimed at Vladimir Tkachenko, a fellow Baptist and one of Pavlova's business colleagues. In the summer of 1996, Tkachenko began receiving threats concerning his role in distributing literature for the business. Tkachenko ignored the threats and, in August, was hit by a truck on the street and killed. One year later, in June 1997, two RNU members broke into Pavlova's home and destroyed office equipment and printed literature. Although their activities were temporarily crippled by this setback, Pavlova and her colleagues reopened the business a few months later, relocating it in Belgorod. Any hope of benefitting from the anonymity of the city was dashed when, in November 1997, RNU members appeared at the new business office and threatened Pavlova and the others with force unless they

---

1. United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100–20 (1988), 1465 U.N.T.S. 85.

shut down operations within one week. When the one-week deadline arrived without the business having been closed, true to their threats, the RNU members destroyed the printing equipment and violently assaulted the workers. During this melee, one of Pavlova's colleagues, Alexander Malachev, sustained injuries from which he later died. Pavlova herself was knocked unconscious and raped. When she finally awakened at the hospital, she learned that, as a result of the ordeal, "[her] internal organs had been ruptured" and that she had to undergo surgery.

Unfortunately for Pavlova, her travails did not end there. While in the hospital, Pavlova provided testimony to the authorities that one of her assailants was a former schoolmate and neighbor, Alexander Tkachenko. Upon her release from the hospital, Pavlova began receiving threats pressuring her to change her testimony. Then, one day, on her way home from a church service in Belgorod, Pavlova heard a gunshot and fell to the ground. The bullet had missed Pavlova and lodged into one of the walls next to her house.

Seeking a safe haven, Pavlova moved in with relatives in Moscow, but RNU members quickly discovered Pavlova's new location. Pavlova changed addresses again, this time sharing space with fellow Baptists who warned her that she was still at risk. Aware that she "had to spend some amount of time outside of Russia in a safe place," Pavlova nevertheless did not want to leave Russia forever. Acting on a desire to visit the United States, Pavlova acquired a visa from the United States Embassy and an airplane ticket through a tour agency where she was working and left Russia. Six months after arriving in the United States, Pavlova extended her visa when she learned from relatives that it was not yet safe for her to return to Russia. After extending her visa, Pavlova discovered that a fellow Baptist, Alexander Cazlitin,[2] had been killed by RNU members—the fourth such murder—and she decided to apply for asylum.[3]

Before her removal hearing, Pavlova submitted into evidence, *inter alia*, (1) a passport, visa and other identification; (2) two letters from the Evangelical House of Prayer in New York, indicating that she is a member; (3) a photograph of herself

**2.** In the record, this individual's name is spelled as both "Cazlitin" and "Casliteen." Unless quoting a passage from the record in which the name is spelled differently, we will adopt the first spelling.

**3.** On cross-examination, Pavlova's testimony to Mr. Horowitz, counsel for the government, included the following exchange:

Q. When you first got your visa in Russia, did you know you wanted to come to the United States and seek asylum?

A. No, I did not want to leave my family for long, or my brothers and sisters. I knew I had to spend some amount of time outside of Russia in a safe place, but I had not been, but I never even thought of leaving forever.

Q. What did you tell the officials at the Embassy when you were applying for the visa as to why you wanted to come to the United States?

A. Well, I told them it was for tourism, and in fact it was for tourism. Because at that time I was doing some work for a tour magazine that also had a tour agency, and they told me that you could get a ticket to go to the United States through our agency, and go to the United States.

Q. Why did you extend your visa after you came here?

A. Because, I extended it because when I spoke to my relatives they told me it's been too short a time to forget about you. Everybody is still talking about you, and you should see if you could stay there a little longer. . . .

. . .

A. I applied for political asylum after I found out about Casliteen's death, because I knew that if I were to return to Russia the same fate awaited me.

showing a pelvic scar; (4) a number of articles from news outlets and other materials concerning religion in Russia, and in particular, the impact of a 1997 Law of Religion that treats minority Christian sects less favorably than the Russian Orthodox Church; (5) a death certificate for Igor Nazin, whom she identified as one of the Baptists beaten to death; (6) a notice from local administrators that "A. Tkachenko," whom she identified as an RNU attacker, had been reprimanded for "small hooliganism"; (7) materials describing RNU, some of which appear to be taken from websites; and (8) a supplemental affidavit, describing in detail the incidents of persecution that form the basis for her asylum claims. Following an adjournment in her hearing, Pavlova submitted, *inter alia*, (9) a letter from a fellow Baptist, Elena Karabutova, that corroborated RNU's violent disruption of the publishing operation and the continuing danger to Baptists, and (10) a letter from a gynecologist, Dr. Jason Halper, stating his conclusion, on the basis of a physical examination, that Pavlova had operations on both ovaries which could have been necessitated by a rape. Dr. Halper also testified to this effect after the adjournment.

In an oral decision, the IJ provided seven grounds for his adverse credibility determination. First, the IJ found it implausible that, having suffered beatings and a rape in Russia, Pavlova would come to the United States solely for the purpose of tourism. Second, the IJ questioned why Pavlova decided to apply for asylum nearly one year after her arrival in the United States and only after learning of the murder of her fellow Baptist, Alexander Cazlitin. Third, the IJ regarded as inconsistent Pavlova's testimony regarding her decision not to see a gynecologist in the United States. Fourth, the IJ faulted her for failing to mention her rape and the killings of the three other fellow Baptists in the statement accompanying her I–589 application for asylum. Fifth, the IJ found it suspicious that Pavlova could not accurately describe her medical condition. Sixth, the IJ found deficient Pavlova's corroborating evidence. Finally, the IJ identified certain pieces of corroborating evidence that, despite their availability, Pavlova had failed to submit.

As another basis for rejecting Pavlova's application for asylum and withholding, the IJ found that Pavlova had not alleged the requisite degree of government involvement in her persecution. The IJ concluded that Pavlova "has at no time indicated that she was ever subjected to persecution, abuse, or harassment by any element of the Russian Government."

Because Pavlova failed to demonstrate eligibility for asylum, the IJ found that she also failed to meet the higher standard for withholding of removal. The IJ further concluded that, taking into account Pavlova's testimony and evidentiary submissions, "there is no basis to believe that [she] has ever been subjected to torture in her home country nor that she would be subjected to torture there upon her return." The IJ denied voluntary departure, as Pavlova gave no evidence that she could afford to buy a ticket to leave the United States.

On December 17, 2002, the BIA summarily affirmed, without opinion, the decision of the IJ. Pavlova filed a motion to reopen, which was also denied.

## I.

Where, as here, the BIA summarily affirms the IJ's decision we review the decision of the IJ directly. *See Secaida–Rosales v. INS*, 331 F.3d 297, 305 (2d Cir.2003). We defer to the IJ's factual findings so long as they are supported by substantial evidence, *see Zhou Yun Zhang*

*v. INS,* 386 F.3d 66, 73 (2d Cir.2004), and we afford "particular deference" in applying the substantial evidence standard to credibility determinations, *Montero v. INS,* 124 F.3d 381, 386 (2d Cir.1997). At the same time, however, we will ordinarily affirm an IJ only on the basis of the reasons he actually articulated, *see Cao He Lin v. U.S. Dep't of Justice,* 428 F.3d 391, 400 (2d Cir.2005), and we will vacate the IJ's decision if he has not applied the law correctly or supported his findings with record evidence, *see Jin Shui Qiu v. Ashcroft,* 329 F.3d 140, 149 (2d Cir.2003).

In the present case, we find that six of the seven bases the IJ gave for his adverse credibility determination are erroneous. Because we cannot confidently predict that the IJ would reach the same conclusion in the absence of these deficiencies, the IJ's adverse credibility determination cannot stand. *Cf. Xiao Ji Chen v. U.S. Dep't of Justice,* 434 F.3d 144, 160–61 (2d Cir.2006); *Cao He Lin,* 428 F.3d at 395.

■ First, the IJ made a factual error in characterizing the substance of Pavlova's testimony when he expressed his understanding that Pavlova "categorically stated that she did not come to the United States to flee any persecution she had experienced in Russia" but instead that she came for tourism. The IJ found it "exceedingly implausible" that Pavlova would suffer the type of persecution she described and then leave Russia for the United States for the sole purpose of engaging in tourism. Pavlova, however, never categorically stated that she came to the United States solely for tourism. Rather, Pavlova testified that she knew that she "had to spend some amount of time outside of Russia in a safe place," suggesting that at least one reason she left

Russia was to flee persecution. To be sure, Pavlova's later testimony "and in fact it was for tourism" suggests that her statement to the Embassy was not a simple pretext for obtaining her visa but that she in fact wished to tour the United States. But at most, all this testimony demonstrates is that Pavlova had a dual purpose in coming to the United States: to escape persecution and to travel to a country that she wished to visit.[4]

■ Second, the IJ compounded the first error when he found "highly implausible" Pavlova's explanation for why she waited nearly one year after her arrival in the United States before applying for asylum. The IJ found it difficult to believe that, given Pavlova's detailed history of persecution and the murder of three fellow Baptists, Pavlova would apply for asylum only after the murder of a fourth. Because we think that the IJ's implausibility finding was the result of flawed reasoning, that finding cannot stand. *Cf. Secaida–Rosales,* 331 F.3d at 307.

The IJ appears to have assumed that the murder of a fourth fellow religious adherent would not create a sufficient increase in fear to overcome Pavlova's initial reservations about permanently leaving her friends and family in Russia and persuade her to seek asylum. In other words, the IJ reasoned that if Pavlova did not seek asylum when she left Russia, after the murder of her three brothers in faith, then it is implausible that a fourth murder would suddenly catalyze her desire to apply. Of course, the IJ was of the view that when Pavlova left Russia, she was not concerned about her own safety. As we have already explained, that view was clearly wrong. Regardless, to make con-

---

4. On remand, the IJ will have to make another credibility determination, this time based on an accurate view of the record.

jectures about the marginal fear created by a fourth murder as compared to a third is the type of speculation that we warned against in *Zhou Yun Zhang*, 386 F.3d at 74.

Furthermore, we do not believe that an asylum applicant should be required to justify a change of heart with respect to applying for asylum by showing that country conditions have in some way worsened, rather than simply persisted, which appears to be the standard the IJ applied. This approach would have the unjust result of effectively barring a particular class of asylum applicants—namely, those who, like Pavlova, resolve to seek asylum only after having first decided not to—from proving a well-founded fear of persecution based on evidence of past persecution and unchanged country conditions. *Cf. Cao He Lin*, 428 F.3d at 399 (" 'A showing of past persecution sets up a rebuttable presumption of a well-founded fear of future persecution' which can be overcome by a showing, by the preponderance of the evidence, that conditions in the applicant's country of nationality have changed sufficiently to destroy the basis for the presumption.") (quoting *Jin Shui Qiu*, 329 F.3d at 148). Finally, we should note that the IJ's approach mistakenly treats the decision-making process that an asylum applicant undergoes in deciding whether to leave one's friends, family, and country forever as if it were a mathematic equation—impersonal, predictable, and static—and ignores the reality that the decision to seek asylum is a process that, for many applicants, is personal, inscrutable, and dynamic.[5]

▮ Third, the IJ failed to address Pavlova's explanation as to why she did not see a gynecologist in the United States until after November 2000, despite the fact that she had been seeing a gynecologist in Russia for the pain she experienced following her surgery. Recently, in *Xiao Ji Chen*, we noted that IJs need not engage in "robotic incantations" in explaining why they find applicants incredible. 434 F.3d at 154 n. 7 (quoting *United States v. Brown*, 98 F.3d 690, 694 (2d Cir.1996)). We have, however, also repeatedly held that the IJ must give reasons for rejecting the testimony of asylum-seekers. *See, e.g., Ramsameachire v. Ashcroft*, 357 F.3d 169, 178 (2d Cir.2004); *Jin Shui Qiu*, 329 F.3d at 149; *cf. Anderson v. McElroy*, 953 F.2d 803, 806 (2d Cir.1992) (concluding that the BIA acted inappropriately by "fail[ing] to issue a reasoned opinion when it purportedly did consider the entire record"). Read in light of the *Ramsameachire* line of precedent, *Xiao Ji Chen* appears to stand for the eminently reasonable proposition that where it is apparent from the record that consideration was given to an applicant's testimony, and where we are capable of reviewing the IJ's consideration for error, it is not necessary for the IJ to recite any particular verbal formula. But where it is not apparent on the face of the record that the IJ has considered the applicant's responses to the IJ's credibility concerns, we do require the IJ to say enough to

---

**5.** In light of strong attachments to their home countries, refugees may venture abroad in a state of uncertainty about the permanence of their departure, hoping that the persecution will abate so that they can return home. *Cf. Baumgartner v. United States*, 322 U.S. 665, 674 n. 3, 64 S.Ct. 1240, 88 L.Ed. 1525 (1944) (citing Gaetano Salvermini's essay on the strong ties that an asylum-seeker retains to his native land). Moreover, it is not uncommon for persons escaping from persecution to articulate a "legal" reason for their departure before making known—or even finalizing—their intentions not to return. And their manner of departure—like a tourist visa—may incorrectly imply a firm intention to return to the land they ultimately abandon.

allow us to understand, and to review, the reasons for rejecting the applicant's testimony.

In the present case, the IJ appears to have ignored Pavlova's explanation that she felt no need to see a gynecologist in the United States because her doctor in Russia had already identified her medical problem and had prescribed medicine to relieve the pain. Pavlova testified that she brought that medicine with her to the United States and that when the prescription ran out, she had a general practitioner in Brooklyn refill it. The IJ's failure to address this explanation was error.

■■ Fourth, the IJ failed to discuss Pavlova's explanation for omitting her rape and the killings of four fellow Baptists in her I–589 statement. Pavlova explained that she had filed the application close to the deadline and had been told that there was not time to have a lengthy statement translated. In any case, asylum applicants are not required to list every incident of persecution on their I–589 statements, *cf. Pop v. INS*, 270 F.3d 527, 531–32 (7th Cir.2001) ("We hesitate to find that one seeking asylum must state in his or her application every incident of persecution lest the applicant have his or her credibility questioned if the incident is later elicited in direct testimony."); *Aguilera–Cota v. INS*, 914 F.2d 1375, 1382 (9th Cir.1990) ("[Petitioner's] failure to file an application form that was as complete as might be desired cannot, without more, properly serve as the basis for a finding of a lack of credibility."). Moreover, Pavlova's statement as a whole described her persecution in general terms, mentioning no specific incidents: "RNU members persecute me for my religion. They humiliated and beat me repeatedly.... I am scared to return to Russia because [RNU] people will kill me there." Thus, the IJ should not have faulted her for failing to include details about the rape and three killings.

■ Fifth, the IJ erred in taking issue with Pavlova's description of her medical condition resulting from her rape as "ruptured internal organs" and "burst ovaries" when, in fact, the medical evidence demonstrated that she had suffered burst ovarian cysts. This minor fault in terminology is, at most, the sort of *de minimis*, nonmaterial inconsistency that we have often stated may not form the basis for an adverse credibility determination. *See, e.g., Xiao Ji Chen*, 434 F.3d at 158 ("If the testimony provided is otherwise 'generally consistent, rational, and believable,' the presence of some inconsistent testimony need not necessarily be fatal to a petitioner's claims if the disparities are 'relatively minor and isolated and do not concern material facts.'") (quoting *Diallo v. INS*, 232 F.3d 279, 288 (2d Cir.2000)).

■ Sixth, the IJ did not adequately justify his rejection of the corroborating evidence that Pavlova proffered: the letter from her fellow Baptist in Russia, Elena Karabutova. The IJ concluded that the letter was fraudulent because it was submitted only after Pavlova's initial hearing, at which the IJ noted Pavlova's lack of corroboration, and hence constituted a "transparent effort by [Pavlova] to provide corroborating evidence after the fact." But Pavlova's submission cannot be discredited solely because it was offered in an effort to remedy the evidentiary deficit that the IJ identified. Incidentally, we should also note that the IJ believed the letter to "provide[ ] very little, if any, details, in support of [Pavlova's] claim." Yet, the letter confirms many of the material aspects of Pavlova's story, including (1) that Pavlova was a Baptist; (2) that she started a religious publishing business with other Baptists in 1996; (3) that she and her fellow Baptist colleagues were

beaten; (4) that RNU thugs carried out a "bloody massacre" in fall of 1997, resulting in "violations of my Sister in Christ, Tatiana"; (5) that Karabutova had been afraid to testify against the perpetrators; and (6) that for Pavlova to return to Russia would "present[ ] real danger for her life."

 The final, and only non-erroneous, basis for the IJ's adverse credibility determination is Pavlova's failure to submit certain corroborating evidence that the IJ identified and that was reasonably available to her. *Cf. Jin Shui Qiu,* 329 F.3d at 153 (citing *Diallo,* 232 F.3d at 285–90) ("[T]o turn down a refugee candidate for want of sufficient corroboration, the adjudicator must (a) identify the particular pieces of missing, relevant documentation, and (b) show that the documentation at issue was reasonably available to the petitioner."). The IJ noted that Pavlova failed to submit evidence corroborating her surgery to repair her ruptured ovarian cyst. Because Pavlova testified that the original hospital record (in Russian) was available and in fact in her possession, it was certainly reasonable for the IJ to believe that such evidence was available. The IJ also observed that Pavlova failed to obtain further corroboration from Russian authorities concerning her beatings and rape. The IJ pointed to Pavlova's testimony that she had cooperated with the authorities in the alleged prosecution of Alexander Tkachenko, the individual who allegedly participated in both the June 1997 burglary and in the attack at Pavlova's publishing business in Belgorod in November 1997. The IJ noted further that Pavlova had been able to obtain documentation from police sources on other occasions, specifically with regard to the June 1997 burglary.

 Nevertheless, Pavlova's failure to submit evidence corroborating her surgery as well as her history of mistreatment cannot support an affirmance in this case. All of the other grounds upon which the IJ rested his adverse credibility determination are erroneous, and it is well-established that lack of corroborating evidence alone is not sufficient to support an adverse credibility determination. *See Diallo,* 232 F.3d at 287–88. Because it is not clear to us that the same decision would have been reached in the absence of errors, we decline to affirm. *See Cao He Lin,* 428 F.3d at 401–02.

 In addition to making an adverse credibility finding, the IJ based his denial of Pavlova's asylum and INA withholding claims on her failure to allege sufficient governmental involvement in her mistreatment. The IJ framed the question presented as whether Pavlova "indicated that she was ever subjected to persecution, abuse, or harassment by any element of the Russian government." However, we have never held that direct governmental action is required to make out a claim of persecution. On the contrary, "it is well established that private acts may be persecution if the government has proved unwilling to control such actions." *Ivanishvili v. U.S. Dept. of Justice,* 433 F.3d 332, 342 (2d Cir.2006) (citations omitted).

Pavlova plainly has alleged that the Russian government was unwilling to control the RNU's religiously-motivated mistreatment of Baptists. Pavlova wrote in her I–589 statement that "[o]fficial authorities support Barkashov people" and indicated in a supplemental affidavit that authorities ignored Baptists' complaints about RNU and helped RNU members "avoid punishment even when their crimes are obvious." In addition, she testified that, based on her own experiences with police inaction in response to complaints of RNU violence—and the experiences of other Baptists—she "had come to understand that [RNU] had

some kind of relationship with the police and that realistically the police wouldn't do anything to help us."

These allegations are reinforced by Pavlova's submission of a number of articles from newspapers and other sources that report discrimination by Russian authorities against "foreign" sects and in favor of the Russian Orthodox Church. Because Pavlova has alleged that the Russian authorities were unwilling to control RNU, we cannot conclude that an IJ would not have found in her favor on this point had the correct legal standard been applied. Accordingly, we cannot affirm this case on the basis of the futility of a remand because the IJ's alternative ground for denying relief is legally erroneous. *Cf. Xiao Ji Chen*, 434 F.3d at 161 (noting that a petition challenging a rejection of an asylum claim could be denied despite errors committed by the IJ where, *inter alia*, "the IJ explicitly relies on a valid alternative ground for denying relief that is not tainted by error" (citing *Cao He Lin*, 428 F.3d at 401–02)).

## II.

For the foregoing reasons, Pavlova's petition for review is GRANTED. We VACATE the BIA's order and REMAND the case to the BIA with instructions to remand to an IJ for further proceedings consistent with this opinion. Because the IJ's ruling on Pavlova's application for withholding of removal under the INA and the CAT was also based, at least in part, upon the adverse credibility determination, we vacate and remand with respect to these two claims as well. While we recognize that "assignment of an IJ is within the province of the Attorney General," *Qun Wang v. Attorney Gen. of the United States*, 423 F.3d 260, 271 (3d Cir.2005) (internal quotation marks and citation omitted), we strongly suggest that Pavlova's case be remanded to an IJ other than the IJ who handled her case originally, *see id.* In light of our disposition of Pavlova's petition for review, we need not address Pavlova's due process claims relating to the IJ's conduct during her removal hearing and the BIA streamlining procedures. *See generally Yu Sheng Zhang v. U.S. Dep't of Justice*, 362 F.3d 155, 158–59 (2d Cir.2004) (per curiam) (describing due process implications of streamlining regulations). In light of the court's decision, Petitioner's pending motion for a stay of deportation is hereby DENIED as moot.