**Yose RIZAL, Petitioner–Appellant,**

v.

**Alberto R. GONZALES,[1] Respondent–Appellee.**

**Docket No. 03–40750.**

United States Court of Appeals, Second Circuit.

Argued: Jan. 19, 2006.

Decided: March 21, 2006.

1. Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Alberto R. Gonzales is automatically substituted for former Attorney General John Ashcroft as the respondent in this case.

H. Raymond Fasano, Madeo & Fasano, New York, NY, for Petitioner–Appellant.

E. Bryan Wilson, Assistant United States Attorney, for Gregory R. Miller, United States Attorney, Northern District of Florida, Tallahassee, FL, for Respondent–Appellee.

Before: WALKER, Chief Judge, NEWMAN and KATZMANN, Circuit Judges.

KATZMANN, Circuit Judge.

This case calls upon us to decide whether a certain degree of doctrinal knowledge of an asylum applicant's claimed religion is necessarily a prerequisite for asylum eligibility on grounds of religious persecution. Yose Rizal, a native and citizen of Indonesia, petitions this Court for review of a September 29, 2003 order of the Board of Immigration Appeals ("BIA"), dismissing his appeal from the denial by an Immigration Judge ("IJ") of his applications for asylum and withholding of removal. Rizal argues that the IJ's determination that he had failed to sustain his burden of proof to qualify for asylum or withholding of deportation was not supported by substantial evidence. We agree. The IJ appears to have erroneously viewed Rizal's lack of detailed doctrinal knowledge about Christianity as automatically rendering incredible his claim of religious persecution, without assessing the genuineness of Rizal's asserted Christian self-identification and his claim that others perceived him as a Christian and had persecuted him on that basis. Because the IJ's adverse credibility determination stemmed from this flawed reasoning, it was not supported by substantial evidence. *See, e.g., Secaida–Rosales v. INS*, 331 F.3d 297, 307 (2d Cir. 2003). Accordingly, we grant the petition for review, vacate the BIA's order, and remand for further proceedings consistent with this opinion.

## I.

### A.

Rizal, now 37 years old, entered the United States in May of 1999. In February of 2000, he filed an application for asylum and withholding of removal, claiming past religious persecution and a well-founded fear of persecution based on his Christianity.

In the personal affidavit that Rizal submitted with his application, he stated that he had enrolled in a Christian high school in 1983 and was baptized as a Christian in 1984. He asserted that since that time, he had been harassed and discriminated against by "the Moslem society." He stated that once he converted to Christianity, his friends and relatives started to verbally harass him, and that his aunt—with whom he had been living—ordered him to leave her home. Rizal further alleged that from 1994 to 1997, there was an "outbreak of religious-based violence around Indonesia." He stated that numerous Christian churches as well as some Buddhist temples were burned to the ground, without investigation by the government. He added that in May of 1997, one co-worker, while calling him "Dirty Christian," punched him in the face and caused his lips to bleed and his teeth to sink into his gums. Rizal further asserted that in 1998, there were several additional major riots targeting non-Muslims, and that on November 19, 1998, his church was one of twenty churches in Jakarta that were burned down by Muslims. He also stated that in August of 1998, some of the Muslim leaders publicly declared that all Christians should convert to Islam or be killed, and that

> [d]uring that time some of the Moslems employees often forced me to become a Moslem, they even threatened me with scissors if I refused. One morning when I came to the shop, three people attacked me from behind. I fell down and they kept beating and hitting me. My nose bled and they dragged me to the hallway. My employer came up and asked if I wanted to become a Moslem. I shook my head telling him no and he told me that I was fired right then. I

was devastated, but again I could not deny my faith as a Christian.

At the beginning of the hearing before the IJ, Rizal swore to the truth of this affidavit, which had been entered into evidence, and his counsel stated that he would rest on the application and affidavit. The government then began its cross-examination of Rizal, at which point Rizal testified that he had converted to Christianity when he attended a Christian high school, where "I learned Bible and I realized that God, the Mighty God is really active and that's when I found like the people influence of learning Bible." Rizal stated that in total, he attended the Christian parochial school for three years, *i.e.*, from 1983 to 1986. He asserted that he had not engaged in any religious study outside of this school.

The government then moved to a specific examination of Rizal's knowledge of Christian doctrine. First, the government asked Rizal where Jesus was crucified; he answered Bethlehem.[2] **[Id.]** The government then asked which apostles wrote the New Testament; Rizal said that he did not remember. Next, Rizal was asked, "Do you know who denied knowing Jesus after the crucifixion?" In response to this question, the following colloquy occurred:

A. Like whenever it comes to the details of the Bible stories, I cannot really recall everything in detail because basically what I learned was what's good and what's evil.

Q. Sir, are you trying to tell me you don't know the answer to the question I asked you?

A. I swear, I just learned about this story from the Bible but I don't really remember everything in detail because what I really remember

---

**2.** The correct answer would have been Jerusalem. According to the Bible, Bethlehem is where Jesus was born. *See* Matthew 2:1; Luke 2:4–7.

was the teaching of what's good and what's evil, like you may not kill, you may not hurt people, and I just enjoy going to church to listen to the preachers.

The IJ then told the government to give Rizal "something a little easier," at which point the IJ herself proceeded to ask him, "Who was Moses?" Rizal said, "Moses was born by Miriam." [3] The IJ then said, "And who prepared the Ten Commandments?" Rizal answered, "Jesus." The IJ responded, "You got that backwards," apparently meaning that Jesus was born by Mary, and that Moses had prepared the Ten Commandments.

Rizal then testified, in response to further questioning, that he had spent time listening to Christian preachers and that he had been baptized with holy water in church. He described his 1984 baptism as follows: "I was in a sitting position and the preachers was like scattering holy water to me. I was down nodding my head together with the other students who were—who were at the same time were being baptized as well. . . . [T]hey have some kind of wording, some kind of words before then, whether we really have the intention of being a Christian, whether we were ready or not and then after that, the preacher spread some holy water and then prayed, we prayed together."

Fairly soon after this testimony, the IJ said to the government, "Do you have any other questions? Because I think I've heard enough." The government responded that it had "a little bit more," noting that Rizal "hasn't testified at all today regarding any of the intents [4] of persecution." The IJ replied, "Well, if I don't find he's a Christian, I don't even think it's necessary. So my point is[,] is there anything else?" The government stated, "Not to do with his identity, Your Honor, no." The IJ commented, "Yeah, because I've got a problem with identity." At this point, Rizal's lawyer, apparently trying to respond to the IJ's doubts about Rizal's Christianity, elicited testimony from Rizal about the church he had attended in Jakarta, Indonesia and about the church that he was currently attending in Woodside, Queens.

The IJ then issued an oral decision, denying Rizal relief on grounds that Rizal had "provided no evidence to corroborate his purported identity as a Christian," [5] and that Rizal "also failed to persuade the Court of the genuineness of his professed Christian faith *based on his inability to demonstrate basic knowledge of Christianity*. For example, he identified Jesus as the preparer of the Ten Commandments and he identified Moses as the son of Mary" (emphasis added).[6] The IJ went on to state that

[d]espite his testimony and church letter showing that he currently attends a Christian church, the Court finds such evidence of a recent connection to Christianity does not overcome the lack of

---

3. Miriam is described in the Bible as Moses's older sister, not his mother. *See* Numbers 26:59; Exodus 2:4–7.

4. We think it likely that "intents" is a mistranscription of the word "events."

5. The IJ noted that Rizal had produced only a copy of the Jakarta "Residence Identification Card" that listed him as a Christian, rather than the original identification card, and also noted that Rizal had not produced records

indicating that the school he attended from 1983 to 1986 was a parochial school. As discussed *infra*, Rizal had, however, provided other forms of corroborating documentation, which were not discussed by the IJ in her oral decision.

6. In fact, as described above, Rizal had actually identified Moses as the son of *Miriam,* which was the name of Moses's older sister.

credibility regarding his past involvement in the Christian faith.

Finally, the Court finds that the harm respondent claims to have experienced in Indonesia because he was a Christian did not involve state action. The only direct injury he experienced was from his family and employer rejecting him, and therefore did not rise to the level of persecution.

The BIA affirmed without opinion in a September 29, 2003 order. Rizal now petitions this Court for review, claiming that the IJ's oral decision was not supported by substantial evidence. In particular, Rizal argues that the IJ did not make an express credibility finding, and seemingly denied the claim for lack of corroboration; he further contends that the IJ focused on Rizal's lack of a "sophisticated understanding of Christianity" at the expense of any analysis regarding whether Rizal was perceived to be a Christian and persecuted on that basis, and that the IJ ignored the background materials that described the persecution of Christians in Indonesia.

## II.

## A.

■ In order to be eligible for asylum, an applicant must show that he or she is a refugee by establishing that he "is unable or unwilling to return to [his home country] because of persecution or a well-founded fear of persecution on account of" one of five enumerated grounds: "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42); *see also Guan Shan Liao v. U.S. Dep't of Justice,* 293 F.3d 61, 66 (2d Cir.2002). We review an IJ's findings under the substantial evidence standard, and therefore "a finding will stand if it is supported by reasonable, substantial, and probative evidence in the

record when considered as a whole." *Secaida–Rosales,* 331 F.3d at 307 (internal quotation marks omitted). We can reverse only by concluding that no reasonable factfinder could have found other than that the applicant established past persecution or a well-founded fear of future persecution. *See, e.g., Tian–Yong Chen v. INS,* 359 F.3d 121, 127 (2d Cir.2004). Alternatively, "where the agency's determination is based on an inaccurate perception of the record, omitting potentially significant facts, we may remand for reconsideration or rehearing, or, if circumstances warrant it, a new hearing." *Id.* (internal citations omitted). This Court will similarly vacate and remand BIA decisions that result from flawed reasoning or the application of improper legal standards. *Secaida–Rosales,* 331 F.3d at 307. Where, as here, the BIA affirms the IJ's decision without opinion, we review the IJ's decision directly as the final agency determination. *See, e.g., Twum v. INS,* 411 F.3d 54, 58 (2d Cir. 2005).

## B.

■ As an initial matter, we disagree with Rizal's contention that the IJ did not make an express credibility determination. We view the IJ's statements that Rizal had "failed to persuade the Court of the genuineness of his professed Christian faith" and that the evidence of Rizal's "recent connection to Christianity does not overcome the lack of credibility regarding his past involvement in the Christian faith" as amounting to an adverse credibility finding.

■ We agree, however, that there was not substantial evidence supporting this adverse credibility finding. As described above, Rizal testified that he had attended a Christian school, been baptized, identified himself as a Christian, attended church in Jakarta, Indonesia, was attend-

ing church in the United States, and had converted because he liked going to church to listen to the preachers and because he appreciated the Christian teachings about "what's good and what's evil." The IJ apparently discounted this testimony— without expressly stating that she did not believe this portion of it—because of Rizal's lack of knowledge as to various aspects of Christian doctrine. The IJ seems to have concluded that because Rizal could not answer the above-described doctrinal questions, his testimony about being a Christian must have been untrue and his religious persecution claim must therefore fail.

 To the extent that the IJ's conclusion stemmed from the rationale that a certain level of doctrinal knowledge is necessary in order to be eligible for asylum on grounds of religious persecution, we expressly reject this approach. The critical showing that an applicant must make to demonstrate eligibility for asylum on religious persecution grounds is that he has suffered past persecution, or fears future persecution, on the basis of religion. 8 U.S.C. § 1101(a)(42). Both history and common sense make amply clear that people can identify with a certain religion, notwithstanding their lack of detailed knowledge about that religion's doctrinal tenets, and that those same people can be persecuted for their religious affiliation. Such individuals are just as eligible for asylum on religious persecution grounds as are those with more detailed doctrinal knowledge.[7] *See, e.g., Ahmadshah v. Ash-*

*croft*, 396 F.3d 917, 920 n. 2 (8th Cir.2005) ("We are... not convinced that a detailed knowledge of Christian doctrine is relevant to the sincerity of an applicant's belief; a recent convert may well lack detailed knowledge of religious custom. Even if [petitioner] did not have a clear understanding of Christian doctrine, this is not relevant to his fear of persecution.").

This is not to say that questions about religious doctrine are never relevant in assessing an asylum applicant's credibility in claiming religious persecution. Indeed, we can certainly imagine instances in which the nature of an individual applicant's account would render his lack of a certain degree of doctrinal knowledge suspect and could therefore provide substantial evidence in support of an adverse credibility finding—for instance, where an applicant claims to have been a teacher of, or expert in, the religion in question. But this was not the case here. At the time of Rizal's hearing before the IJ, he had not attended parochial school (the only place in which, according to his testimony, he had engaged in religious study) for over fifteen years. He never claimed in his testimony to be an expert in Christian doctrine or even to have a deep understanding of Christianity, but simply stated that he appreciated the Christian teachings about good and evil, had chosen to convert for that reason, attended a Christian church regularly because he enjoyed listening to the preachers, and identified as a Christian. This testimony

---

**7.** Indeed, even an individual who does *not* subscribe to a certain religion, but is nonetheless being persecuted on account of others' perception that he does, may well be able to establish a religious persecution claim under a theory of "imputed religion" analogous to the "imputed political opinion" theory that we recognized in *Chun Gao v. Gonzales*, 424 F.3d 122 (2d Cir.2005). *See id.* at 129–130 ("[T]he question in this case is not whether

Gao was or is a practitioner of Falun Gong, but whether authorities would have *perceived* him as such. . . . If authorities would persecute him as an adherent or as a supporter of Falun Gong, then such persecution would be 'on account of' an enumerated ground.") Given Rizal's claim to be an adherent of Christianity, however, this case does not squarely present that issue, and we therefore decline to reach it.

should—if credible—have been sufficient to establish his identity as a Christian, regardless of whether he could pass the doctrinal quiz posed to him by the government and the IJ. *See, e.g., Zhen Li Iao v. Gonzales,* 400 F.3d 530, 533 (7th Cir. 2005) (noting that one of the "disturbing features...that bulk large in the immigration cases that we are seeing" was *"[a]n exaggerated notion of how much religious people know about their religion.* Of course a purported Christian who didn't know who Jesus Christ was, or a purported Jew who had never heard of Moses, would be instantly suspect; but many deeply religious people know very little about the origins, doctrines, or even observances of their faith."); *Yong Ting Yan v. Gonzales,* 438 F.3d 1249, 1255 (10th Cir.2006) ("We are troubled that while the IJ relied heavily on [petitioner's] responses to the mini-catechism administered at the hearing, stressing his formal, doctrinal knowledge of Christianity, he barely addressed, and gave no good reason for rejecting, [petitioner's] testimony about his personal experiences with Christianity...as [petitioner's] counsel before the BIA put it, [petitioner] is 'a believer and adherent of Christianity and not a seminary student.' ")

We note that the IJ also briefly provided one other basis for her adverse credibility determination: her conclusion that Rizal had "provided *no* evidence to corroborate his purported identity as a Christian" (emphasis added). This assessment was inaccurate. It is true that, as the IJ stated when rendering her oral decision, Rizal did not provide attendance records verifying his parochial school attendance from 1983 to 1986, nor the original Jakarta "Residence Identification Card" that listed his religion as "Christian." Rizal did, however, provide a copy of that identification card. He also submitted his original baptismal certificate, which had been issued to

him by the Protestant Evangelical Church of Indonesia upon his request in 1998, and which listed his date of baptism as June 16, 1984. In addition, he provided an unsworn March 15, 2000 affidavit from an Indonesian priest who stated that Rizal had been an active member of a church in Tanggerang West Java; an unsworn June 29, 2000 letter of acknowledgment from the "Gereja Protestan [*sic*] Indonesia" congregation in Queens, stating that Rizal was a member of the congregation; and an unsworn March 16, 2000 affidavit from his sister, who stated that she was still residing in Jakarta and practicing Islam, but that Rizal had converted to Christianity and had thus received "a lot of threaten [*sic*] from the people around him," and had been a.target of the "Holly [*sic*] War in Jakarta."

■ In any event, even had the IJ been correct that Rizal provided no corroborating evidence, lack of corroboration alone cannot provide the sole basis for an adverse credibility finding. *See Diallo v. INS,* 232 F.3d 279, 290 (2d Cir.2000). Thus, given that we have now rejected the only other ground for the adverse credibility finding—namely, what the IJ perceived as Rizal's lack of "basic knowledge" about Christianity—it necessarily follows that the adverse credibility finding was not supported by substantial evidence.

■ Of course, to be eligible for asylum, Rizal also had to show that he had suffered persecution on the basis of his Christian faith. To this end, in his affidavit, he stated that Muslim leaders had publicly declared in August of 1998 that Christians who refused to convert to Islam would be killed; that he personally had been physically attacked by people calling him "Dirty Christian" and threatening him with bodily harm if he did not convert to Islam; that major riots had broken out in

Indonesia targeting non-Muslims; and that many Christian churches—including his own—had been burned down by Muslims. He further asserted that the government had made no effort to stop the Muslim violence against Christians. At the beginning of the hearing, Rizal explicitly swore to the truth of the contents of that affidavit.

The IJ, however, essentially ignored the bulk of Rizal's affidavit. Indeed, when the government noted near the end of the hearing that it had not yet cross-examined Rizal about "any of the [events] of persecution," the IJ responded, "Well, if I don't find he's a Christian, I don't even think it's necessary.... I've got a problem with identity." Moreover, to the extent that the IJ did discuss Rizal's asserted persecution in rendering the subsequent oral decision, the IJ focused only on the fact that his family and employer had rejected him, which, the IJ stated, did not rise to the level of persecution. This characterization, which utterly omitted the affidavit's description of physical persecution that the government was unable or unwilling to control, reflected a failure on the IJ's part to consider relevant evidence.

■ It appears that the IJ deemed it unnecessary to reach the issue of persecution in a meaningful way, given that she had already concluded that Rizal's belief in Christianity was not genuine. But had the IJ found that Rizal's Christian belief was genuine and progressed to an analysis of whether he had suffered persecution, the physical persecution described in his affidavit would have been relevant evidence that provided significant support for his claim. *See, e.g., Yan Chen v. Gonzales,* 417 F.3d 268, 272, 275 (2d Cir.2005) (stating that "[c]ertainly, beatings and torture can constitute persecution"); *Tian–Yong Chen,* 359 F.3d at 128 ("[P]hysical harm inflicted on an applicant on account of his

religious beliefs is a circumstance relevant to establishing past persecution, and such harm is also relevant to establishing a well-founded fear of future persecution."). Moreover, persecution can certainly be found when the government, although not itself conducting the persecution, is unable or unwilling to control it, just as Rizal had alleged here. *See, e.g., Pavlova v. INS,* 441 F.3d 82, 85 (2d Cir.2006) ("[W]e have never held that direct governmental action is required to make out a claim of persecution. On the contrary, 'it is well established that private acts may be persecution if the government has proved unwilling to control such actions.' ") (citing *Ivanishvili v. United States DOJ,* 433 F.3d 332, 342 (2d Cir.2006)).

Rizal's affidavit about religious persecution of Christians in Indonesia was also consistent with the February 2001 country condition report on Indonesia in the record from the U.S. State Department (entitled "Country Reports on Human Rights Practices"), which stated that "[r]eligious violence and the lack of an effective government response to punish perpetrators and prevent further attacks led to allegations that officials were complicit in some of the incidents or, at a minimum, allowed them to occur with impunity. There were numerous instances of attacks on churches, mosques, temples, and other religious facilities during the year [2000]." Also in evidence were numerous articles from the fall of 1998 about Muslim attacks on Christians in Indonesia, including a November 23, 1998 *USA Today* article entitled "6 die in Indonesia in Muslim attacks on Christian Churches"; a November 24, 1998 *Newsday* article entitled "Christians Attacked in Indonesian Riots; Muslim youths torch churches"; and a November 22, 1998 CNN article entitled "At least six killed in Jakarta as ethnic, religious ten-

sions flare." These articles were entirely consistent with Rizal's description of the violence in late 1998 that prompted him to leave Indonesia in the spring of 1999.

The IJ did not consider any of this background evidence regarding the persecution of Christians in Indonesia because of her conclusion that Rizal had not established his Christian identity in the first place. Indeed, the IJ explicitly stated, "I marked into evidence the *Country Reports on Human Rights Practices.* But I find... a problem with identity. He didn't establish it, so I'm not going to necessarily go into that." Had the IJ concluded that Rizal's belief in Christianity was genuine and progressed to an analysis of persecution, however, this evidence would have been highly relevant. *See Yan Chen,* 417 F.3d at 273–274 ("Reviewing courts have found it particularly troubling when immigration courts overlook country condition reports submitted by petitioners....The BIA has repeatedly emphasized the importance of providing background evidence concerning general country conditions, especially where it tends to confirm the specific details of the applicant's personal experience.") (internal quotation marks and citation omitted).

Because the IJ's decision resulted from flawed reasoning and the failure to consider relevant evidence (namely, the physical persecution and inaction of the government described in Rizal's affidavit, as well as the background evidence regarding persecution of Christians in Indonesia), we hold that the decision was not supported by substantial evidence and therefore vacate and remand it. Moreover, we instruct the BIA to further remand to the IJ for purposes of holding a new hearing on Rizal's application, given the IJ's conclusion

in the prior hearing that it was not "necessary" for Rizal to testify about the persecution that he had suffered, and the resultant lack of any actual testimony in regard to the incidents of physical violence that he described in his affidavit. *Cf. Tian–Yong Chen,* 359 F.3d at 129–30 (similarly instructing the BIA to remand to the IJ for a new hearing).

On remand, the IJ should make an express credibility finding that is not based on Rizal's knowledge of Christian doctrine, but rather on (1) Rizal's credibility in stating that he had converted to Christianity, attended a Christian church, and was publicly identified as a Christian; and (2) Rizal's credibility in stating that he was subjected to physical violence and other persecution as a result of his Christianity. This latter determination should also take into account the background materials supporting Rizal's description of the situation faced by Christians in Indonesia.[8]

### III.

In accordance with the foregoing, we grant Rizal's petition for review and remand to the BIA for further proceedings consistent with this opinion.

---

8. The credibility finding may also take into account any lack of corroboration perceived by the IJ, but such lack of corroboration may not be the sole basis for an adverse credibility finding. *See Diallo,* 232 F.3d at 290.