

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-25-2007

# Zheng v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-2751

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Zheng v. Atty Gen USA" (2007). *2007 Decisions.* Paper 888.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/888

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 06-2751

MING CHUN ZHENG,
                              Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES

On Petition for Review of an Order of the
Board of Immigration Appeals
BIA No. A79-682-679
(U.S. Immigration Judge: Honorable Donald V. Ferlise)

Submitted Pursuant to Third Circuit LAR 34.1(a)
May 17, 2007

Before: SCIRICA, Chief Judge, FUENTES and SMITH, Circuit Judges

(Filed June 25, 2007)

OPINION OF THE COURT

PER CURIAM.

Ming Chun Zheng petitions for review of the decision by the Board of

Immigration Appeals ("BIA") denying him asylum, withholding of removal and relief

under the Convention Against Torture ("CAT"), and ordering him removed to China. For the foregoing reasons we will grant the petition.

I.

Zheng is a citizen of the People's Republic of China from Fujian Province with an eighth grade education. According to Zheng's testimony and asylum application, in 2001, he was sick with an unknown malady. He felt dizzy and lacked energy, but doctors could find no problem with his body. He claimed that "[a]t the time, I felt I lost my soul." (A.R. 235.) In June 2001, his family brought him to an "underground" Christian church that met at the house of Mei Zhu Zheng.

The underground church was a small group of people who, according to Zheng, had no formal leader or official name. (A.R. at 82.) They would meet on Sundays and discuss the gospels and teachings of Jesus Christ. After attending these church services, Zheng's "sickness" disappeared and he became an active participant in the church and a believer. (A.R. at 235; 82-3.)

In September 2001, Communist Party cadres raided the church. (A.R. at 92.) Zheng and approximately 20 other church members were arrested and taken to the local police station. (A.R. at 95.) At the police station Zheng as well as others were hit and accused of participating in illegal meetings and attempting to undermine the current

2

regime. Zheng said that he was told "[y]ou this kind of group together actually broadcast saying that Chinese government are wrong."[1] (A.R. at 96.)

Zheng and the other church members were eventually released because the police had not found evidence of any illegal activities. Id. The following week Zheng resumed his attendance at the church. However, the next week, the church was raided again by the local cadres. Zheng managed to escape arrest by fleeing through the back door when he first saw the cadres approach. After hiding with a relative, Zheng, using the services of a smuggler, left China for the United States.

Zheng was apprehended as he entered the United States without inspection in St. John in the United States Virgin Islands, on or around July 18, 2002. He was released on bond and moved to New York City where he retained an attorney. On August 30, 2002, through his attorney, Zheng moved to change the venue of his proceedings from New Orleans to New York City. Along with the motion for a change of venue, Zheng filed an application for asylum, withholding of removal, and relief under CAT. (A.R. 239.)

At the first hearing before the immigration judge ("IJ") in New York, Zheng, through his attorney, conceded removability and reiterated his request for asylum, withholding of removal, and relief under CAT. The IJ castigated Zheng's attorney

---

[1]There appear to have been problems with the translation at the hearing. Zheng's answers to even simple questions often resulted in statements that were as garbled as this one. The translator also repeatedly needed to ask for clarification. See e.g. A.R. at 84; 86; 90; 97. Whether the interpreter received the clarification he needed and to whom he addressed his questions is not indicated in the record.

because the asylum application that he had filed was facially insufficient. (A.R. at 50.) The application contained no information as to the factual basis for Zheng's asylum claim. The IJ ordered Zheng's attorney to file a new application that was legally sufficient before June 19, 2003. At the next hearing, Zheng's attorney had still not filed a corrected asylum application. (A.R. at 55.) Further, Zheng was not in attendance because his attorney had erroneously informed him that the hearing had been adjourned. (A.R. at 54.) Again the hearing was adjourned to allow Zheng to file a legally sufficient asylum application.

Zheng then moved to Philadelphia to live with his uncle, and venue for the proceedings was changed again. At the next hearing, on September 4, 2003, Zheng's attorney produced a second asylum application, dated June 6, 2003, and filed it with the court. The IJ, however, rejected the supporting documentation because none of the documents had been authenticated in accordance with 8 C.F.R. § 287.6.[2] (A.R. at 19.) The Government did not receive a copy of the second asylum application, and the IJ ordered that Zheng's attorney provide a copy within 30 days.

At Zheng's next hearing on February 15, 2005, Zheng's attorney had still not provided the Government with a copy of the second asylum application. After the hearing, the IJ denied Zheng's claims for relief and ordered him removed. The IJ found

_____

[2]It is unclear what documents Zheng's attorney attempted to submit in support of his application because they never made it into the record. The IJ mentioned that the group exhibit which he rejected contained a Chinese residency card and a household register.

4

that Zheng was not credible and that he had filed a frivolous asylum application. Zheng's first asylum application contradicted his testimony as well as the complete application that he filed in 2003. The first application listed his religion as "Buddhist" and did not include persecution on the basis of religion as one of the grounds for asylum. The IJ did not credit Zheng's explanation for this discrepancy. The IJ also found that Zheng's testimony that the church was first raided by the police on September 15, 2001, conflicted with the affidavit in support of his second application. The IJ did not believe that Zheng was a Christian because he showed little familiarity with the Bible, could not recount any stories from any of the Gospels, and could not say to which denomination the underground church belonged. Further, the IJ found it incredible that, even though Zheng lives in Philadelphia with his uncle, he attends church in Chinatown in New York City.

Zheng, now acting pro se, appealed to the BIA. The BIA, citing Matter of Burbano, 20 I. & N. Dec. 872, 874(BIA 1994), affirmed the IJ, and found that Zheng's explanation for the discrepancies between his two asylum applications was "unconvincing." Further, the BIA found that he exhibited little knowledge of Christianity and was vague about the details of the underground church. Zheng timely filed a petition for review.

## II.

A grant of asylum allows an alien who is otherwise subject to removal to stay in the United States because he is a refugee. Abdulai v. Ashcroft, 239 F.3d 542, 545 (3d

5

Cir. 2001). A refugee is someone who is unable or unwilling to return home because of persecution or a well-founded fear of persecution on the basis of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42)(A). To establish a well-founded fear of persecution, an applicant must show a subjective fear as well as an objectively reasonable possibility that he would suffer such persecution if he returned to his country. 8 C.F.R. § 1208.13(b)(2)(i); Lie v. Ashcroft, 396 F.3d 530, 537 (3d Cir. 2005). An alien's testimony, by itself, is sufficient to meet this burden, if "credible." 8 C.F.R. § 208.13(a); Gao v. Ashcroft, 299 F.3d 266, 272 (3d Cir. 2002). Withholding of removal is a non-discretionary form of relief which prohibits the removal of an alien to a country where there is a clear probability his life or freedom would be threatened on account of one of the protected grounds in the proposed country of removal. 8 C.F.R. § 1208.16(b); Chen v. Gonzales, 434 F.3d 212, 216 (3d Cir. 2005). "Because this standard is higher than that governing eligibility for asylum, an alien who fails to qualify for asylum is necessarily ineligible for withholding of removal." Ghebrehiwot v. Attorney Gen. of U.S., 467 F.3d 344, 351 (3d Cir. 2006).

Under 8 U.S.C. § 1252(a)(1), courts of appeals only have jurisdiction to review "final order[s] of removal." Abdulai, 239 F.3d at 548. However, where "the BIA both adopted the IJ's adverse credibility determination and discussed some, but not all, of the underlying bases for the IJ's adverse credibility determination, we have jurisdiction to review both the BIA's and the IJ's decision." Xie v. Ashcroft, 359 F.3d 239, 242 (3d Cir.

6

2004); see also Paripovic v. Gonzales, 418 F.3d 240, 243 n.4 (3d Cir. 2005).  Because the BIA adopted the IJ's opinion by citing Burbano, we review both the decision of the BIA and that of the IJ.  See Xie, 359 F.3d at 242.

An adverse credibility determination is a factual one, and must be "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Gao, 299 F.3d at 272.  Accordingly, an adverse credibility determination should not be overturned unless "any reasonable adjudicator would be compelled to conclude to the contrary."  8 U.S.C. § 1252(b)(4)(B).  However, a negative credibility finding may not be based on flawed reasoning and the "reasons [for the credibility finding] must bear a legitimate nexus to the finding and must be 'valid grounds' for disregarding the applicant's testimony."  Secaida-Rosales v. I.N.S., 331 F.3d 297, 307 (3d Cir. 2003)(internal citations omitted).  Although our review of a credibility finding is generally deferential, "that deference is expressly conditioned on support in the record, and deference is not due where findings and conclusions are based on inferences or presumptions that are not reasonably grounded in the record."  Dia v. Ashcroft, 353 F.3d 228, 250 (3d Cir. 2003)(en banc)(internal citations and quotation marks omitted).

### III.

The IJ and the BIA found Zheng not to be credible based on supposed inconsistencies that disappear on examination, flawed reasoning, and speculation that is

7

not based on the record. Accordingly, we decline to uphold the credibility determination and will grant the petition for review.

Regarding the inconsistency between Zheng's two asylum applications, Zheng testified that a "Chinese lady" at his attorney's office filled out the application for him. She never reviewed the completed application with him: he was only told to sign the application. The IJ did not believe him, finding that, if Zheng were to be believed, "it would never result in an application for asylum reflecting that he is Buddhist and also reflecting that religion was not one of the basis [sic] of his claim for asylum and for withholding." (A.R. at 41.) The BIA, following the IJ's reasoning, noted that the same counsel who represented him at the asylum hearing signed both applications and that "[i]t is reasonable to conclude that [the attorney] reviewed the information in the initial application with the respondent before either signed the form." (A.R. at 2.) Therefore, both the BIA and IJ concluded, the discrepancy must have been caused by Zheng changing his story rather than any error in the attorney's office.

However, the fact that the same attorney signed both forms strengthens rather than undermines Zheng's claim that the discrepancy was due to an error in the attorney's office, and the BIA's "reasonable" conclusion is contradicted by the record of Zheng's attorney's performance throughout the proceedings.

Zheng's attorney in this matter had shown himself to be less than fastidious in his representation; the presumption that he was diligent in the preparation of Zheng's first

8

asylum application does not find support in the record. Zheng's first asylum application, as noted by two different IJs, was legally insufficient because it lacked the promised affidavit that would have provided the factual basis for his claim. The BIA does not explain why it is reasonable to assume that Zheng's attorney would act with the requisite care in reviewing the application with Zheng before submitting it, but be careless enough to omit the most important part of the same application. Further, the BIA's presumption that Zheng's attorney generally took such care in his filings is contradicted by his performance throughout the proceedings. He jeopardized Zheng's asylum claim by waiting over a year before remedying the deficiency in the first application,[3] misinformed Zheng about the date of one of the hearings, and filed a contradictory application without providing any explanation. By the same reasoning used by the IJ and BIA, none of these gross errors could have occurred. But they did.

The IJ's finding that Zheng was not credible because he is insufficiently knowledgeable about Christianity is based on unwarranted speculation as to the level of biblical knowledge that a parishioner at an underground church in China would have. "[A] detailed knowledge of Christian doctrine is [not] relevant to the sincerity of an

---

[3]Absent special circumstances, an asylum application must be filed within one year of an alien's arrival. 8 U.S.C. § 1158(a)(2)(B). Zheng's first application was originally ruled to be insufficient to satisfy this statutory deadline, (A.R. at 55), and therefore, Zheng's attorney's failure to file the second application within one year of Zheng's arrival would have barred his claim for asylum. However, after his case was transferred to Philadelphia, the IJ there, *contra* the ruling in New York, ruled that his first asylum application satisfied § 1158(a)(2)(B).

applicant's belief; a recent convert may well lack detailed knowledge of religious custom." Ahmadshah v. Ashcroft, 396 F.3d 917, 920 n. 2 (8th Cir.2005). "Both history and common sense make amply clear that people can identify with a certain religion, notwithstanding their lack of detailed knowledge about that religion's doctrinal tenets." Rizal v. Gonzales, 442 F.3d 84, 89 (2d Cir. 2006). The relevant inquiry is not whether Zheng could pass an examination for a confirmation class, but whether he exhibited the knowledge of Christianity consistent with his claimed belief. See id.

Although Zheng was confused when asked to recount a story from the Gospel of John and did not provide a story, (A.R. at 85-7), he responded to the IJ's frequent questions regarding Christian doctrine with appropriate, if simple, answers. When the IJ asked Zheng if he remembered any speeches at the underground church, he replied "I have heard that all human beings who follow the path that Jesus Christ had lead us the right path and move forward . . . [a]s Christians we have Jesus Christ who is truth."[4] (A.R. at 89.) When the IJ asked Zheng about the first time the underground church was raided, Zheng answered "Jesus Christ [] was asked by God to come here . . . to save us, save all the people on earth . . . so when we die, after we die we will have eternal life."[5]

---

[4]The IJ asked Zheng to repeat the final part of this answer, apparently because the phrasing is irregular. It is. It comes from John 14:6, "Jesus answered, 'I am the way and the truth and the life. No one comes to the Father except through me.'" John 14:6 (New International Version).

[5]"For God so loved the world that he gave his one and only Son, that whoever believes in him shall not perish but have eternal life." John 3:16.

(A.R. at 94-5.) When the IJ asked him about Jesus' miracles, Zheng mentioned that Jesus "had made people who were blind and let them have their sights again."[6] (A.R. at 91.) He was able to do this because "Jesus Christ is a saint" and because " He is the son of God." Id.

Zheng is not a biblical scholar, nor does he claim to be. Rather he claims to be an adherent of Christianity as preached in an underground church in China run out of a woman's house. He currently attends a church in New York City which he likes because its services are "[v]ery simple." (A.R. at 116.) He chose this church because "[o]thers, I don't understand what they say." Id. The IJ found that, even a member of a "simple" family church such as the one that Zheng testified to attending, would have more biblical knowledge than Zheng demonstrated at the hearing. However, this conclusion is based on speculation: the IJ was unable to point to anything in the record to support his conclusion.[7] See Rizal, 442 F.3d at 89.

The IJ found that Zheng's testimony that the underground church was raided on September 15, 2001, and then again two weeks later contradicted his affidavit. However,

_____

[6]The story of Jesus healing a blind man is found in John 9:1-11.

[7]The fact that Zheng could not name the denomination to which the "underground church" belonged is also irrelevant. Based on its description and the fact that the church was unaffiliated with any of the established churches in China, it is likely that its denomination is only relevant to taxonomists of religion rather than practitioners. That Zheng could not place it within a classification system that would be irrelevant and unknown to a parishioner of an underground church does not justify the inference that he was never a member of such a church.

11

his affidavit says substantially the same thing. His affidavit does not give a date for the first raid, but says that the second raid occurred in "September 2001." (A.R. at 235.) His testimony is perfectly consistent with that time line. Further, the IJ's contention that "it is difficult for the Court to believe that the respondent would travel all the way from Philadelphia . . . all the way to New York City merely to attend this family church" is pure speculation.[8]

An asylum applicant's testimony may not be rejected based solely on presumptions and speculation. See Dia, 353 F.3d at 250. Accordingly, we will grant the petition for review and remand the case to the BIA for further proceedings. We agree with the Government that the BIA did not affirm the IJ's alternative holding that, even if Zheng was credible, he did not establish a well-founded fear of persecution. (Resp. Br. at 3 n.3.) Therefore, we do not express any opinion regarding whether Zheng has suffered past persecution or has a well-founded fear of persecution in the future, but leave it to the agency to address this issue on remand. See I.N.S. v. Orlando Ventura, 537 U.S. 12, 16 (2002).

---

[8]The IJ's description also mischaracterizes Zheng's testimony. Zheng lived in New York City for over a year and during that time he joined the Family Church. He testified that he traveled to New York City when he could, approximately every other weekend, to attend church and visit his friends who lived there.